[S. F. No. 16988.  In Bank.  July 3, 1944.]

MARKET STREET RAILWAY COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION et al., Respondents.

Cyril Appel and Pillsbury, Madison & Sutro for Petitioner.

Everett C. McKeage, Roderick B. Cassidy, Wyman C. Knapp, Frank B. Austin and John M. Gregory for Respondents.

SHENK, J.—The Railroad Commission on its own motion ordered an investigation into the reasonableness of the rates and the sufficiency and adequacy of the service rendered by Market Street Railway Company in San Francisco. After hearings the commission filed its opinion and order reducing the rate of base cash fare for transportation of passengers in the city from seven to six cents. The company petitioned for a rehearing which was denied. The matter is here on its petition for a review pursuant to section 67 of the Public Utilities Act [Stats. 1915, p. 115, as amended; Deering's Gen. Laws, 1937, Act 6386].

The petitioner attacks the proceedings and order as a depri-

vation of orderly due process, and as a confiscation of its property.

### I

■ On the first, the procedural question, the company claims that it was denied due process by a failure of notice that it was being charged with the maintenance of unreasonable rates; that the issue of unreasonableness of rates was not framed during the course of the hearing; that the commission introduced no evidence of unreasonableness of the prevailing rate, and that the company was not afforded an opportunity to present evidence on the issue.

The petitioner does not claim that it did not receive a copy of the ''Order Instituting Investigation,'' which was mailed to it. That order notified the company that ''the commission, believing that public interest demands an inquiry into the reasonableness of the rates, as well as the sufficiency and adequacy of the service rendered by the Market Street Railway Company,'' would institute an investigation upon its own motion ''into the reasonableness of the rates, charges, classifications, rules and regulations'' of the company, ''and also into the reasonableness, sufficiency and adequacy of the operations, service and facilities of said company.'' The 10th day of May, 1943, was set as the time for the commencement of the public hearings. Notice of the time of hearing was also sent to other public utilities, and public and civic bodies and officers, including the California Street Cable Railroad Co., the Mayor and the Board of Supervisors of the City and County of San Francisco, the Department of Public Works, the Board of Public Utilities, the City Attorney, the San Francisco Chamber of Commerce, the Office of Defense Transportation, and others. Hearings were conducted on May 10, July 15, and September 15, 1943. Thirty-three exhibits were introduced, consisting of reports and documents bearing on income and revenues, studies and reports of value, analyses of profit and loss accounts, operative expenses, statistical studies in passenger revenue and car and bus hours, as well as studies in operative equipment, traffic checks, results of operation, charges and revisions in operative practices, and comparative rate and operation analyses of Market Street Railway and the Municipal Railway of San Francisco. Certain voluminous annual and monthly reports in addition were by stipulation deemed to be before the com-

mission. The oral evidence is contained in three volumes of transcribed testimony. Witnesses were produced by the commission, by the city and by the company. J. G. Hunter, produced by the commission, the first witness to testify, gave a résumé of the matters for investigation, which included "operating expenses, taxes, depreciation, studies on rate base figures, the estimated operating results that would obtain under different fare structures." Comparative balance sheets, charges and reports were introduced dealing with these subjects. Comparisons were made between appraisals based on book value and on historical cost. Testimony on the state of the physical properties, on employment conditions, on available manpower, on adequacy of the service and facilities, on the possibility of interchange of facilities and a universal transfer system, on the company's franchise obligations in roadbed upkeep, and on elements to be considered in evaluating service, was also received. Mr. Samuel Kahn, who is president and general manager of the company and an engineer and expert in utility management, and Mr. Leonard V. Newton, vice-president of the company and engineer in charge of operations, testified on behalf of the company. On direct and cross-examination Mr. Kahn testified and presented exhibits illustrating his opinion of the effect of various rate structures. Mr. Newton's testimony was confined mainly to operations and employment conditions.

Thus, the company had the required notice of hearing on the question of reasonableness of the rates and full opportunity at the hearings to present any further evidence on the rate issue, had it chosen to do so. The notice and the course of the hearings were adequate to inform the company that the reasonableness of the present rate was under investigation. The discussion on this phase of the review may be concluded by stating that the various studies, reports and other statistical data, including the record in prior rate proceedings, together with the exhaustive investigation into the present state of the properties and the adequacy and value of the service, must be deemed to have had a direct bearing on the rate issue. The fact that the financial and rate base studies were required to be produced by the commission as a part of the record was sufficient to give to the company ample warning that the commission was seriously proceeding into an investigation of the reasonableness of the existing rate. In fact Mr. Kahn's testimony clearly indicated that he so understood the purpose

of the inquiry. The statement of counsel that the elements of fair play were so lacking in the proceedings as to call for a conclusion that orderly due process was not observed is not supported by the record. The company had the opportunity to supplement or explain the reports and data introduced in evidence. The commission also accorded the opportunity for argument on the petition for rehearing, but no supplement or explanation of the submitted data was referred to on the argument on rehearing. At that time the petitioner merely contended that a rehearing should be granted in order to conduct further studies on the estimates of future revenues, expenses and net return under various rates, as well as valuation studies to supply evidence of different rate bases, including reproduction cost, different from those on which the commission placed its estimate of a fair return from operations under the reduced rate. Under these circumstances the comment of the court in *Railroad Com. of California* v. *Pacific Gas & Elec. Co.*, 302 U.S. 388, at p. 393 [58 S.Ct. 334, 82 L.Ed. 319], is appropriate here: "As we have seen, the respondent [petitioner] was heard, the Commission received the testimony of respondent's witnesses, its exhibits and argument. There is nothing whatever to show that the hearing was not conducted fairly." The petitioner's further demands are more properly addressed to the matter of reasonableness in relation to due process when we come to consider the second phase of this review, namely, the issue of confiscation.

## II

The opinion of the commission gives the essential background. The year 1852 saw the first omnibus service in San Francisco; 1860 the first street railway; and 1873 the first cable line. The cable was more suited to the hilly terrain and some of the horsecar lines were converted to the cable method of operation. In 1893 Market Street Railway Company was incorporated and took over eleven of seventeen independent street car lines.

By city charter amendments ratified by the electors in 1902, provisions were enacted for municipal acquisition of public utilities. (Stats. 1903, pp. 586 et seq.) Privately owned street railways were permitted to hold franchises for not to exceed twenty-five years, whereupon tracks and overhead construction should revert to the city without cost.

In 1902 United Railroads of San Francisco was incorporated. It succeeded to the properties of Market Street Railway Company and five additional lines. The earthquake and fire of 1906 caused heavy losses and a large reconstruction program ensued.

In 1912 the first municipal line was placed in operation. Municipal railway expansion proceeded rapidly in order to serve the traffic during the Panama Pacific International Exposition in 1915. The city built lines of extension parallel with some of the Market Street Railway lines.

United Railroads became unable to pay the interest on its bonded indebtedness and in 1921 its properties were acquired by the bondholders under foreclosure sale and were in turn sold to Market Street Railway Company. The twenty-five year franchise limitation was not enforced. Pursuant to section 131 of the city charter (Stats. 1931, p. 3052), the company surrendered its franchises and was granted a twenty-five year permit to continue operations subject to the right of the city to acquire the properties upon paying the fair value of the operative properties exclusive of going concern value or other intangible elements. In 1925 the company began placing motor buses in operation and by December, 1942 it had 125 buses in service.

The competitive factor induced by the continuing expansion of the municipal railway system became a constantly increasing threat to the operational and financial integrity of the company. The Market Street Railway Company came under the jurisdiction of the Railroad Commission, while the municipal lines remained subject to the regulation and supervision of the city. The municipality retained a five-cent fare even though the system was operated with a deficit. Market Street Railway's original franchises included a five-cent fare clause.

In 1937 Market Street Railway applied to the Railroad Commission for an increase of the fare to seven cents. The application was granted to the extent of permitting a two-cent transfer charge. At that time the company was admittedly not seeking the increase on the basis of a fair return on its investment, but sought merely to meet $1,000,000 additional annual operating expense due to increased taxes and labor costs. (Dec. No. 29889, 40 C.R.C. 525.) In its opinion in that proceeding the commission said: ''It is clear from this record that operation under any reasonable fare struc-

ture will not in the near future yield a revenue sufficient to provide a full return on any reasonable rate base of applicant's property, so long as the competing Municipal lines are operating on a 5-cent fare. For that reason this record does not deal with the matter of establishing a rate base for this property. In fact, the only reference to valuation in this record is that which is contained in the application to the effect that a valuation made [in a report filed with the supervisors in 1929] by the late M. M. O'Shaughnessy, former City Engineer of San Francisco, shows that the present fair value of applicants property is at least $24,000,000." Its decision (ibid., p. 532) discloses that the president of the company was of the opinion "that experience alone could tell what results would obtain if the proposed fare structures were put into effect."

In 1938 the company made a supplemental application for an increase to a seven-cent fare on a showing that revenues had declined and that further increased operating expenses were imminent due to higher labor costs. The commission granted the application to the extent of permitting a seven-cent fare, four tokens for twenty-five cents. Again the commission noted that the company was not seeking the new rate on the basis of a fair return on its investment. (Dec. No. 30849, 41 C.R.C. 349, 351.)

The city of San Francisco granted franchises to bus companies for operation on a ten-cent fare in direct competition with the company, but refrained from granting any such franchises which would compete with the municipal lines. The company attempted to effect economies by installing one-man operation in its electrically operated cars, but that practice was discontinued when the federal courts upheld a San Francisco city ordinance forbidding one-man operation of street cars. (San Francisco v. Market Street Railway Co., 98 F.2d 628, 305 U.S. 657 [59 S.Ct. 357, 83 L.Ed. 426], 306 U.S. 667 [59 S.Ct. 460, 83 L.Ed. 1062].) The company had attempted to abandon unprofitable lines, but had been unable to obtain permission from the city to do so.

Consequently in the same year (1938) the company made a second supplemental application for a straight seven-cent basic fare. The showing was that as a result of the increase in fares in a twelve-month period more than 10,000,000 passengers had been diverted to the municipal lines, and the

company was operating at a loss. San Francisco is a city with what is termed a "high riding habit" and a large percentage of the lost traffic consisted of short-haul riders who declined to pay the seven-cent fare. In that proceeding the commission concluded that the company was entitled to relief to prevent a collapse or partial collapse of its service, and, accepting the company's estimate that revenues could be increased only by a straight seven-cent fare, it granted the petition conditionally. It required the company forthwith to petition the board of supervisors of the city for permission to abandon operation on specified lines and for such form of relief as might be necessary to eliminate "jitney" competition. The company complied with the requirements and on December 12, 1938, the board of supervisors denied the requests. Thereupon, on December 27, 1938, the commission ordered the new schedule based on a straight seven-cent fare effective January 1, 1939.

The straight seven-cent basic fare has continued until the present time. The hoped for results, however, did not immediately materialize, even with the stimulation afforded by the holding of the Golden Gate International Exposition in 1939-1940. Compared with the year 1936, the last year under the five-cent fare, the 1941 traffic and revenue reached the lowest ebb, showing a falling off of 64,056,000, or 42 per cent, in revenue passengers, and $1,426,282, or 19 per cent, in passenger revenue. The figures show a decline of 39 per cent in revenue as compared to the maximum revenue year of 1925. The state of the operative properties and the adequacy of the service continued to decline. The company became unable to discharge its franchise obligations for roadbed maintenance and the city was attempting to collect $1,691,162.76 claimed as arrears.

After the entry of this country into the present world war in 1941, and upon the stepped-up production of war materials, an abnormal increase in traffic occurred resulting in increased revenue, accompanied, however, by a further marked deterioration in the operative properties and in the service to the public.

The commission examined the condition of the properties and the adequacy of the service in relation to the prevailing rates for transportation. It found evidence of long-time neglect, deterioration, mismanagement, indifference to urgent public need, and other causes productive of poor service, not

all of which were chargeable to the war. The company refused to lease idle equipment to the municipality although the latter had sought to put it into service on its own lines after the Office of Defense Transportation had denied it priority rights for new equipment because of the existing condition of idleness of rolling stock in San Francisco, none of which was attributable to the city. The company was unsuccessful in retaining or drawing its share of the available manpower, which was being diverted to the Municipal Railway. Undeniably there is evidence of "deplorable condition of track, of deferred maintenance, unfulfilled street paving obligations, obsolescence of street car equipment, and the failure of the company to replace, during pre-war years, uneconomical and outdated facilities by modern, more efficient, and more profitable means of mass transportation," conditions which had grown progressively worse over a period of years antedating the commencement of the war. Service, with the exception of that to establishments directly engaged in the war effort, such as shipyards and army and navy concentration points, steadily declined in quality and adequacy. The commission stated that an analysis of the company's finances showed that over a period of years the company had diverted to payment of indebtedness funds urgently required for proper maintenance and for the replacement of depreciated property.

The record makes it apparent, and the commission recognized, that in the past competition was the factor which prevented the company from reaping financial benefit from any rate structure; that heretofore the private automobile has given the railways competition; that that source of competition is partially eliminated during the period of rubber and gasoline shortage; that the increased traffic due to war activities will not last, and that as soon as transportation conditions return to normal the company will again be handicapped by a seven-cent fare against the competition of the Municipal Railway and the automobile; and that under any rate structure the condition of the company will grow even worse than at the former low level unless the service is greatly improved. It is also disclosed that while prior to the war the five-cent fare produced a greater gross and net annual revenue than any fare in excess of five cents, a five-cent fare structure will not realize any net return to the company under a competitive system of operation.

Compared with Market Street Railway, the Municipal Railway under a five-cent fare has gained in quality of service and equipment, and in financial returns. As with Market Street Railway, however, the Municipal Railway's increase in financial returns began with the abnormal increase in traffic.

Attempts had been made to have the city of San Francisco acquire the Market Street Railway. Transportation surveys and property appraisals had been prepared and negotiations carried on over a long period of years. At the general election of November 3, 1942, the electorate of San Francisco rejected a proposed revenue bond issue to raise $7,950,000, the price theretofore settled upon at which the company would sell its properties to the city. A similar proposition at the same figure was again submitted and again rejected at a special election held April 20, 1943.*

The commission rejected the company's book figures of cost and depreciation and selected the offered price, $7,950,000, as the value of the utility and rate base for the purpose of computing the return to the company under various rate structures. It concluded that operation under a six-cent fare, after deduction from gross passenger revenue of operating expenses, depreciation and taxes, would produce a net return of slightly more than six per cent on the rate base of $7,950,000. It computed that a seven-cent fare, allowing an increase in operating expenses to $7,940,000, including $750,000 for depreciation and $590,000 for taxes, would yield annual net operating revenues of $760,000, a return of 9.6 per cent on the rate base. Figuring the return from a seven-cent fare on a depreciation allowance of $500,000, which is the amount the company had been charging off annually, the percentage would be 12.7. The commission found both these rates of return excessive and unjustified by the present service. Its computation under a five-cent fare, with a depreciation allowance of $500,000, indicated a deficit of $1,153,000. On a six-cent basic fare it estimated annual gross revenue at $8,500,000, operating expenses, depreciation and taxes at $8,000,000, leaving a net operating income of $500,000,

*Since this review proceeding was commenced and on May 16, 1944, the electorate of the city voted favorably on a proposition to acquire the operative properties of the company on a self-liquidating plan for $7,500,000.

slightly more than six per cent on the base figure of $7,950,000, which return it found to be reasonable. It said that consideration of service alone and of the value of service to the patron would justify the fixing of a five-cent fare; but it determined that a six-cent fare was a just, fair and reasonable rate, provided every possible and reasonable effort promptly be made by the company to furnish an improved service, and that a fare in excess of six cents was unjust and unreasonable.

No contention is urged that a six per cent return on the investment is not adequate, under present conditions, to attract capital and keep a utility in a solvent condition. The question is whether the record clearly establishes that the selection of the figure of $7,950,000 as the rate base will result in confiscation of the company's property.

The commission rejected all other figures and selected the offered price as that most truly representative of the value of the company's properties. It said that ''the only available indication in this record of the present value of the company's properties used and useful in the public service is the resolution of the company's Board of Directors, passed on March 25, 1943.'' The resolution (Exhibit 9) reads as follows:

''SALE OF THE OPERATIVE PROPERTIES OF THE MARKET STREET RAILWAY COMPANY TO THE CITY AND COUNTY OF SAN FRANCISCO. The President advised the Board that he had agreed with the Mayor and other city officials, as well as the Board of Supervisors, to sell the operative properties of Market Street Railway Company to the City and County of San Francisco for the sum of $7,950,000.00 cash, which was the same amount agreed upon for the sale of the operative properties when a charter amendment for the purpose of raising such sum by a revenue bond issue was submitted to and rejected by the qualified electors of the City and County of San Francisco at the general election on November 3rd, 1942. The President stated further that a similar charter amendment, with several changes therein, for the purpose of raising the sum agreed upon for the sale of the operative properties of the Market Street Railway Company to the City and County of San Francisco by a revenue bond issue would be submitted to the qualified electors of the City and County of San Francisco at a special election to be held on April 20,

1943. The President also stated that the price mentioned is the amount that had been agreed upon for the purchase by the City and County of San Francisco of the operative properties of the company after negotiations in respect thereto which covered a considerable period of time and, as previously mentioned, is the best price obtainable therefor.

"WHEREUPON, on Motion of Director Fay, duly seconded by Director Scott, the following resolution was adopted.

"RESOLVED, that the actions of the President in negotiating the sale of and agreeing to sell the operative properties of the Market Street Railway Company to the City and County of San Francisco for the sum of $7,950,000.00 cash be, and the same hereby are, ratified, approved and confirmed; and it is

"FURTHER RESOLVED, that the officers of the Market Street Railway Company be and they are hereby authorized and directed to perform all necessary and proper acts in order to carry out and complete the sale of the operative properties of the Market Street Railway to the City and County of San Francisco for the sum of $7,950,000 cash."

The commission adopted the price stated in the offer as the "present fair market value," without the necessity of expressing an "opinion on the reasonableness of the figure of $7,950,000 as an exact measure of the present fair value of the company's operative property in its present depreciated physical and service condition, with its past earning record and its prospective future under the competitive transportation situation obtaining in San Francisco." The petitioner contends that the ultimate figure adopted by the principals for the sale of the property to the city and therefore by the commission as the present fair market value was based on a capitalization of earnings; that the commission should have proceeded on a consideration of depreciated reproduction cost and historical cost, in accord with the holding of the Supreme Court of the United States in *Smyth* v. *Ames,* 169 U.S. 466 [18 S.Ct. 418, 42 L.Ed. 819], and other cases.

In *Smyth* v. *Ames,* after stating that the basis of all calculations as to the reasonableness of rates must be the fair value of the property being used for the convenience of the public, the Supreme Court proceeded to lay down the essential matters for consideration in ascertaining that value. (p. 546.) "And in order to ascertain that value the original cost of con-

struction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.''

Subsequent decisions emphasized the necessity for finding fair value by weighing all the elements prescribed in *Smyth* v. *Ames*. Notably in *Minnesota Rate Cases*, 230 U.S. 352, at 434 [33 S.Ct. 729, 57 L.Ed. 1511], the Supreme Court said that there must be a ''reasonable judgment having its basis in a proper consideration of all relevant facts'', repeating the language quoted from *Smyth* v. *Ames*. The emphasis progressed to the extent that in many cases, if one factor or element, particularly that of reproduction cost new, had not received consideration in arriving at ''present fair value,'' it was determined that the constitutional due process requirement had been violated. (*Southwestern Bell Tel. Co.* v. *Public Service Com.*, 262 U.S. 276 [43 S.Ct. 544, 67 L.Ed. 981]; *Bluefield etc. Co.* v. *Public Service Com.*, 262 U.S. 679 [43 S.Ct. 675, 67 L.Ed. 1176]; *McCardle* v. *Indianapolis Water Co.*, 272 U.S. 400 [47 S.Ct. 144, 71 L.Ed. 316]; *United Railways & Elec. Co.* v. *West*, 280 U.S. 234 [50 S.Ct. 123, 74 L.Ed. 390]; *cf. Pacific Gas & Elec. Co.* v. *San Francisco*, 265 U.S. 403 [44 S.Ct. 537, 68 L.Ed. 1075]; *Los Angeles Gas & Elec. Co.* v. *Railroad Com.*, 289 U.S. 287 [53 S.Ct. 637, 77 L.Ed. 1180]; *Railroad Com. of Cal.* v. *Pacific Gas & Elec. Co.*, 302 U.S. 388 [58 S.Ct. 334, 82 L.Ed. 319].) Thus due process was deemed not to have been observed if it was shown that the regulatory body, in evaluating the plant or operative properties for rate purposes, had not considered depreciated reproduction cost as well as book cost, actual (sometimes called original or historical) cost, capitalization, etc. Since calculations under each formula led to widely dif-

ferent results it became apparent that the *Smyth* v. *Ames* rule had proved itself unworkable. Criticisms of it are found in the dissenting and concurring opinions in *Southwestern Bell Tel. Co.* v. *Public Service Com.*, 262 U.S. 276, 289 [43 S.Ct. 544, 67 L.Ed. 981]; *Pacific Gas & Elec. Co.* v. *San Francisco*, 265 U.S. 403, 416 [44 S.Ct. 537, 68 L.Ed. 1075]; *McCardle* v. *Indianapolis Water Co.*, 272 U.S. 400, 421 [47 S.Ct. 144, 71 L.Ed. 316]; *United Railways & Elec. Co.* v. *West*, 280 U.S. 234, 255 [50 S.Ct. 123, 74 L.Ed. 390]; and *West* v. *Chesapeake & Potomac Tel. Co.*, 295 U.S. 662, 680 [55 S.Ct. 894, 79 L.Ed. 1640]. In the Southwestern Bell Tel. Co. case, Justice Brandeis (Justice Holmes concurring with him), disagreed with the majority view that the commission must consider reproduction cost new under the slogan "Estimates for tomorrow cannot ignore prices of today," and advocated the prudent investment theory.

In *Georgia Ry. & P. Co.* v. *Railroad Com.*, 262 U.S. 625 [43 S.Ct. 680, 67 L.Ed. 1144], decided less than three weeks later, Justice Brandeis writing the majority opinion distinguished the Southwestern Bell Tel. Co. case. The court decided that the commission was not bound to slavish adherence to reproduction cost new in a case where the evidence showed that it gave consideration to that element, the dissenters seeking to apply the Southwestern Bell decision. On the same day the court also decided *Bluefield etc. Co.* v. *Public Service Com.*, 262 U.S. 679 [43 S.Ct. 675, 67 L.Ed. 1176], wherein reproduction costs had not received consideration and the court reversed, following the Southwestern Bell case, Justice Brandeis disagreeing with the grounds of reversal.

In the case of *McCardle* v. *Indianapolis Water Co.*, 272 U.S. 400, 408 [47 S.Ct. 144, 71 L.Ed. 316], the court required a further step, namely, that the future as well as the present must be regarded; that present value could not be determined without an honest and intelligent forecast as to probable price and wage levels, probable yield over operating expenses, etc., during a reasonable period in the immediate future.

In 1933 the Supreme Court obviously began to anticipate a departure from adherence to *Smyth* v. *Ames*. In the case of *Los Angeles Gas & Elec. Co.* v. *Railroad Com.*, 289 U.S. 287 [53 S.Ct. 637, 77 L.Ed. 1180], the court in effect upheld the California commission which, in making a rate reduction

order, had rejected reproduction cost figures as "too uncertain and hypothetical to enter into a rate base figure." The court relied on the Minnesota Rate Cases for the theory that the cost-of-reproduction method did not justify the acceptance of results which depended upon mere conjecture. It pointed out the necessity of distinguishing between the legislative and judicial functions; that it is the appropriate task of the commission to determine the value of the property affected by the rates it fixed, and that of the court, in deciding the question of confiscation, not to lay down a formula, much less to prescribe an arbitrary allowance, but to examine the result of the legislative action in order to determine whether its total effect is to deny to the owner of the property a fair return for its use. It said: (p. 304) "We do not sit as a board of revision, but to enforce constitutional rights. *San Diego Land & Town Co.* v. *Jasper,* 189 U.S. 439, 446 [23 S.Ct. 571, 47 L.Ed. 892]. The legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof and the Court may not interfere with the exercise of the State's authority unless confiscation is clearly established."

In April, 1934, the Supreme Court upheld the commission's order prescribing rates for telephone service in the case of *Lindheimer* v. *Illinois Bell Tel. Co.,* 292 U.S. 151 [54 S.Ct. 658, 78 L.Ed. 1182]. It rejected the company's claim that the rates were grossly confiscatory because not based on estimates of original or book cost and reproduction cost new; for, to recognize the claim, it stated, would be to sanction "a large increase over the rates which have enabled it to operate with outstanding success. Elaborate calculations which are at war with realities are of no avail."

*West Ohio Gas Co.* v. *Public Utilities Com.,* 294 U.S. 63 [55 S.Ct. 316, 79 L.Ed. 761] (January 1935), reiterated the

restricted function of the court declared in *Los Angeles Gas & Elec. Co.* v. *Railroad Com.,* 289 U.S. 287, saying, (p. 70) [53 S.Ct. 637, 77 L.Ed. 1180] ''Our inquiry in rate cases coming here from the state courts is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation. If this level is attained, and attained with suitable opportunity through evidence and argument (*Southern Ry. Co.* v. *Virginia,* 290 U.S. 190 [54 S.Ct. 148, 78 L.Ed. 260]) to challenge the result, there is no denial of due process, though the proceeding is shot through with irregularity or error.''

Nevertheless, less than six months later, in *West* v. *Chesapeake & Potomac Tel. Co.,* 295 U.S. 662 [55 S.Ct. 894, 79 L.Ed. 1640] (June 1935), the court affirmed a decree enjoining the commission from enforcing prescribed rates because of the method employed to ascertain value, namely, by the use of price trend indices, rather than on the ground that the rate was confiscatory.

In April, 1936, in *St. Joseph Stock Yards Co.* v. *United States,* 298 U.S. 38, 53 [56 S.Ct. 720, 80 L.Ed. 1033], the majority of the court again reviewed the distinctive functions of commission and court, saying that the ''judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence . . . Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency . . . We have said that 'in a question of ratemaking there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing' . . . The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the ratemaking power unless confiscation is clearly established . . .''

In *Railroad Commission of Cal.* v. *Pacific Gas & Elec. Co.,* 302 U.S. 388 [58 S.Ct. 334, 82 L.Ed. 319], the court, reemphasizing the principle from *Los Angeles Gas & Elec. Co.* v. *Railroad Com., Lindheimer* v. *Illinois Bell Tel. Co., West Ohio Gas Co.* v. *Public Utilities Com.,* and other cases, re-

fused to consider as an error amounting to a denial of due process the commission's treatment of the company's estimate of reproduction costs as without probative value. The dissenting opinion of Justice Butler, who invoked application of the *Smyth* v. *Ames* rule, pointed out that the California Commission consistently refused to apply the *Smyth* v. *Ames* criteria.

Then in *Federal Power Com.* v. *Natural Gas Pipeline Co.,* 315 U.S. 575 [62 S.Ct. 736, 86 L.Ed. 1037] (March, 1942), the court again appeared to approve nonadherence to the rule of *Smyth* v. *Ames* by utility commissions. It upheld an interim order of rate reduction by the Federal Power Commission, acting under the Natural Gas Act of 1938, 52 Stat. 821, 15 U.S.C. sec. 717, which required that rates and charges for transportation and sale of gas in interstate commerce should be "just and reasonable." The gas company sought to have $8,500,000 claimed going concern value included in the rate base. In upholding the commission the court said: (p. 586) "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustment which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

Finally in *Federal Power Commission* v. *Hope Natural Gas Company,* decided January 3, 1944, the court freed commissions from the necessity of following *Smyth* v. *Ames*. There the commission reduced gas rates. In testing the value of the utility property, it had omitted an item of $17,000,000 expended for drilling operations in an unregulated period of the utility's operations, and which in the same period had been recouped from earnings by having been charged off to operating expenses. The court rejected the contentions that the rate base should reflect the reproduction cost and trended original cost, and that the well drilling costs of $17,000,000 should have been included in the rate base. It said: "Rate-

making is indeed but one species of price-fixing. *Munn* v. *Illinois*, 94 U.S. 113, 134 [24 L.Ed. 77]. The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid . . . It does, however, indicate that 'fair value' is an end product of the process of rate-making not the starting point . . . The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

"We held in *Federal Power Commission* v. *Natural Gas Pipeline Co., supra*, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments'. Id., p. 586. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Id., p. 586. Under the statutory standard of 'just and reasonable' it is the result reached and not the method employed which is controlling. *Cf. Los Angeles Gas & Electric Corp.* v. *Railroad Commission*, 289 U.S. 287, 304-305, 314 [53 S.Ct. 637, 77 L.Ed. 1180]; *West Ohio Gas Co.* v. *Commission* (No. 1), 294 U.S. 63, 70 [55 S.Ct. 316, 79 L.Ed. 761]; *West* v. *Chesapeake & Potomac Tel. Co.*, 295 U.S. 662, 692-693 [55 S.Ct. 894, 79 L.Ed. 1640] (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences . . . The conditions under which more or less might be allowed are not important here. Nor is it important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at. For we are of the

view that the end result in this case cannot be condemned under the Act as unjust and unreasonable from the investor or company viewpoint.'' Answering other contentions the court said: ''Congress has entrusted the administration of the Act to the Commission not to the courts. Apart from the requirements of judicial review it is not for us to advise the Commission how to discharge its functions.''

The petitioner contends that the cases of *Federal Power Com.* v. *Natural Gas Pipeline Co.* and *Federal Power Com.* v. *Hope Natural Gas Co.* are inapplicable because they involved the commodity gas, as distinguished from the use of common carrier property. The petitioner does not contend, however, that the rate base theory of public utility valuation is not applicable in the present case. That theory of evaluating public utility property as determinative of the question of confiscation was adopted by the commissions, and assumed by the court to be proper, in the cited cases. It follows that the holdings of the Supreme Court in those cases may be considered in a case involving common carriers. Therefore those cases, particularly the Supreme Court's decision in the Hope Natural Gas Company case, permits unreasonableness to be shown, not by the method employed to formulate a rate base, but by the fact that the ''end result'' of the commission's order interferes with the company's successful operation, its financial integrity, its ability to maintain credit and attract capital, and to compensate investors for risks assumed—in short, fails to provide a return sufficient to induce the utility enterprise to ''perform completely and efficiently its functions for the public.'' The Supreme Court refrained from endorsing a particular method of valuation to arrive at the result of reasonableness, but left commissions free to follow *Smyth* v. *Ames,* or to select one or more of the heretofore recognized criteria or a different method, which, even if irregular, would not invalidate an order unless unreasonableness were clearly established. Thus responsibility for rate fixing, insofar as the law permits and requires, is placed with the commission, and unless its action is clearly shown to be confiscatory the courts will not interfere.

Section 32 of the Public Utilities Act (Stats. 1915, p. 115, as amended; Deering's Gen. Laws, 1937, Act 6386), empowers the California commission, after a hearing had upon its own motion or upon complaint, to make findings on the rea-

sonableness of the rates charged by a public utility and to lower or increase the rates accordingly. By the same section the commission also has power and it is made its duty, after a hearing had on its own motion or on complaint, to determine the facilities and operation adequate to meet the public requirements, and to fix the just, reasonable and adequate rates for such service.

Section 67 of the Public Utilities Act provides for a review by this court for the purpose of having the lawfulness of the order and decision of the commission inquired into. That section restricts the review to a determination of whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the State of California. It further provides that the findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as hereinafter noted, and that such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination. The exception to finality is that ''in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the Constitution of the United States, the Supreme Court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the Commission material to the determination of said constitutional question shall not be final.'' That section also gives the court power to enter judgment either affirming or setting aside the order or decision of the commission.

That part of section 67 which requires the independent judgment of the court on the law and the facts and withholds from the commission's findings and conclusions finality on constitutional questions, was added by amendment in 1933. This court thereafter recognized that the amendment was responsive to language in certain United States Supreme Court decisions which indicated that the Legislature must provide the means whereby the courts should exercise an independent judgment on the law and the facts when federal constitutional questions were involved. (*Southern California Edison Co.* v. *Railroad Com.*, 6 Cal.2d 737 [59 P.2d 808]; *American Toll Bridge Co.* v. *Railroad Com.*, 12 Cal.2d 184 [83

P.2d 1].) The United States Supreme Court and this court assumed to exercise such judgment without statutory language, deeming it appropriate for the protection of constitutional rights; but in the exercise thereof, as variously stated in the decisions, the reviewing court refrains from sitting as a board of revision; and will not disturb the findings or conclusions of the regulatory body unless invasion of constitutional rights is clearly established. In the Edison Company case this court pointed out that the amendment added nothing which was not theretofore a part of our state law; that it did not materially affect the procedure theretofore followed in a review under the Public Utilities Act, and did not make the court a trier of disputed questions of fact already resolved by the commission. We said: (p. 748) "If the mere challenge on federal constitutional grounds was intended by the amendment of 1933 to be sufficient to take the case out of the rule that the findings and conclusions of the commission in such cases should be final and beyond review, then we would have grave doubt of the power of the legislature thus to transfer to this court the traditional functions of the commission." In *American Toll Bridge Co.* v. *Railroad Com., supra,* it was again stated that the amendment did not change the scope of the judicial review.

In the present proceeding, as in the recent cases of *Federal Power Com.* v. *Natural Gas Pipeline Co.* and *Federal Power Com.* v. *Hope Natural Gas Co.,* the standard for rate fixing is that of reasonableness. The petitioner herein must be charged with the burden of showing that the evidence does not support the commission's finding of value, and that the reduced rate is unreasonable and will result in confiscation of its property. That burden is coupled with a strong presumption of the correctness of the findings and conclusions of the commission. Ordinarily a public utility is a monopoly and is not subject to the travail of competition. Because of its monopolistic character, public interest requires that it submit to regulation for the protection of the consumer, and the utility in return is entitled to protection of its investor interest. In the case of monopolistic utilities it is possible to say that regulation to accomplish the two-fold purpose may be a relatively simple matter. But here the commission was confronted with facts which are unusual

in utility rate regulation. It was faced with the problem of evaluating the property of a utility which was in direct competition with a municipal utility offering similar service in the same community, in large part serving the same territory, and over which the commission had no regulatory power. From the year 1912, when a competitive system of street car operation was established in San Francisco under municipal regulation, such obstacles to profitable operation by the commission regulated utility were created that commission regulation in effect gave way to regulation by competition. The evidence is clear that during the early competitive period and until the abnormal stimulation in public use brought about by the present world war, competition necessitated operation at a loss. Since the commencement of competition the company has not devoted to replacement and repair the amounts charged off on its books for those purposes, and its charges to depreciation reserve were lower than the actual annual plant consumption. In this connection it is significant that for tax purposes the company's accrued depreciation figure was shown to be $26,834,000, and its total depreciation reserve figure only $9.902,000. The factors which affected the value of the investment in this case justified the commission in refusing to follow the practice of adopting as an annual charge to plant consumption the company's book depreciation reserve or any other hypothetical sum approved by accounting practices. The evidence supports the conclusion that the company permitted unusual deterioration in view of negotiations for sale to the city started many years ago. The ordinary methods or theories of depreciation accounting therefore would not reflect the true record of the past annual plant consumption and the result, were such methods adopted, would not be in conformity with the facts. On the other hand, the evidence of obsolescence, depletion, depreciation and deterioration is such as to justify the commission's observation that there was no available or procurable evidence of the fair value of the property except the amount contained in the company's offer to sell to the city, made in the period when the business was profitable. Acceptance of the company's book figures or of the amount of outstanding capitalization, in order to arrive at the present worth of the properties, would result in a figure inflated so far above fair value as to impede the commission's authorized

regulatory effort to restore the company as a useful public servant performing its functions adequately. Capitalization in any event has little relation to the depreciated value of the investment. Also going concern value can have little if any place in the rate base under the facts except as the special factor of competition has so affected that value as to indicate it at nil. Separate appraisal of the going concern element is not required. (*Federal Power Com.* v. *Natural Gas Pipeline Co., supra.*)

It cannot be said that under the facts of this case arbitrary action resulted merely from the commission's rejection of book values and capitalization, its refusal to make precise estimates of actual deterioration, of going concern or other values, and its acceptance of the company's offer of sale to the city made in a profitable period as the best evidence of the fair value of the utility in the present condition of its operative properties. The commission expressly refrained from considering whether the amount of the offer in relation to value under all the conditions was not too high. Furthermore, it appears that studies of valuation for sale purposes were also made by the city and by the commission, and only after such studies was a sale price selected which was deemed commensurate with the fair value of the property under existing conditions.

It is the real and not the nominal paper valuation that determines the amount of the investment on which the utility is entitled to a return. (See Pond, Public Utilities, Fourth ed., vol. 2, pp. 1117, 1118.) As said in *Lindheimer* v. *Illinois Bell Tel. Co.*, 292 U.S. 151 [54 S.Ct. 658, 78 L.Ed. 1182], the "actual experience of the company is more convincing than tabulations of estimates . . . Elaborate calculations which are at war with realities are of no avail." There is no fundamental or statutory law which will preclude the commission from evaluating a public utility in accordance with the actualities. So to proceed is not to take private property for public use without compensation. There is no denial of due process in rejecting conjectural and unsatisfactory estimates of value, or in treating the petitioner's estimates as without probative value. (*Railroad Com. of Cal.* v. *Pacific G. & E. Co.*, 302 U.S. 388, 397-398 [58 S.Ct. 334, 82 L.Ed. 319].) As was said in *Los Angeles Gas Co.* v. *Railroad Com.*, 289 U.S. 287, 306 [53 S.Ct. 637, 77 L.Ed.

1180], "The public have not underwritten the investment. The property, on any admissible standard of present value, may be worth more or less than it actually cost. The time and circumstances of the outlay, and the effect of altered conditions demand consideration."

■ The petitioner has not shown that the results are not in accord with the realities. Both before the commission and in this court it contented itself merely with urging that the commission proceeded erroneously in selecting for rate making purposes the offer price of $7,950,000, because, so it claims, that figure was based on a capitalization of earnings. The petitioner made no offer or attempt to show that the value fixed by the commission did not represent either the true depreciated legitimate cost or the true depreciated actual cost. In *Minnesota Rate Cases*, 230 U.S. 352, 566 [33 S.Ct. 729, 57 L.Ed. 1151], it was said that "the company having assailed the constitutionality of the state acts and orders was bound to establish its case, and it was not entitled to rest on expressions of judgment when it had it in its power to present accurate data which would permit the court to draw the right conclusion." Since it is impossible to say in the light of the evidence in this proceeding that the figure selected by the commission does not bear a proper relation to the fair value of the utility under existing conditions, it must be concluded that the petitioner has not shown arbitrary action on the part of the commission in selecting the sale offer price as the rate base, or that the evidence does not support the commission's finding that the figure selected represents at least fair value, if not more than that.

■ The petitioner has also failed to meet the burden cast upon it to establish that the return on the rate base under the reduced fare will prevent the utility's functioning adequately from the company or investor standpoint. The commission has the experience and the data at hand from which to cull the estimates of probable increase in traffic under a reduced fare and improved service, and of the probable future operating revenues, expenses, and other costs. This court will not disturb its findings on those disputed questions of fact. The company is now and for several years has been doing an abnormally increased traffic business with returns greatly in excess of its operating costs plus increased reserves for depreciation and taxes. It does not question

that under a seven-cent fare it has enjoyed a return of more than a fair percentage above the constitutional line of confiscation on the fair value as found by the commission. Nor is it questioned that a return of six per cent on the value of its capital investment is unconstitutional. The petitioner claims that the commission's estimates are false, and that falsity resides in the fact that at the prevailing cost per head for passenger transportation, it will suffer a deficit on the estimated volume of increased traffic at the six-cent fare. The fallacy, however, is in the assumption that the cost ratio under the six-cent fare will be the same as under the seven-cent fare. The commission answers that the assumption is not true, inasmuch as the increase in traffic is expected, not necessarily in the peak hours, but in large part from the patronage in off hours which was diverted to Municipal Railway, or discontinued upon the inception of the higher rate, and which is expected to be regained materially upon the reduction of the fare and the improvement of the service. The petitioner also claims that the commission did not consider the evidence of a probable increase in labor costs pursuant to pending negotiations with labor unions. The commission on the other hand states that it did give consideration to that element. The commission's figures, with increased allowances for operating expenses, depreciation and taxes, must be deemed to resolve these disputed points adversely to the petitioner. "Long operation and adequate records make forecasts of net operating revenues fairly certain." (*Driscoll* v. *Edison L. & P. Co.*, 307 U.S. 104, 120 [59 S.Ct. 715, 83 L.Ed. 1134].)

The foregoing discussion demonstrates that the interests of the investor have received constitutional protection by the action of the commission. ■ Under rule by competition and the consequent great deterioration in its capital investment, the utility's ability to attract capital has undoubtedly suffered. But this is not an element that can be controlled by the regulatory body beyond the possibility of insuring to the utility a fair return on the value of the capital investment when business is profitable. The fact that the utility has suffered deficits in the past does not justify excessive profits in the future. (*Los Angeles Gas & Elec. Co.* v. *Railroad Com.*, 289 U.S. 287, 313 [53 S.Ct. 637, 77 L.Ed. 1180]; *Federal Power Com.* v. *Natural Gas Pipeline Co.*, 315 U.S. 575, 590 [62 S.Ct. 736, 86 L.Ed. 1037].) "When a busi-

ness disintegrates, there is damage to the stockholders, but damage also to the customers in the cost or quality of service." (*West Ohio Gas Co.* v. *Public Utilities Com.* (No. 1), 294 U.S. 63, 72 [55 S.Ct. 316, 79 L.Ed. 761].)

The record is also clear that the commission has not been arbitrary in acting for the protection of the public which is under compulsion to use the present depleted and inadequate service, or which may be expected to make use of an improved service. As the commision said in its opinion, "After making such allowance (for war time difficulties) the important question remains to what extent the ratepayer, under war conditions, should be compelled to pay the same or higher rates for an inadequate and inferior service while the utility enjoys abnormal profits." It is unnecessary to consider whether the seven-cent fare would still be unreasonable were the petitioner performing a fully adequate and efficient service. The findings of inadequacy in the maintenance and service are supported by the evidence. The commission is empowered under the statute in fixing the fare to take into consideration the quality of the facilities and service. The commission decided that even in war time improvement was possible, and that the value of the improved service would be no more than six cents. The problem of the value of the service, and the correctness of the commission's decision on the consumer interest, do not involve constitutional questions, so long as otherwise the investor or company interest has received adequate consideration by the commission. When the company interest has received constitutional protection, the findings of the commission on the consumer interest become final in the proceeding. The question involving that interest then has been answered by the commission correctly pursuant to the statute and the authorities to the effect that the reasonableness of rates should not be considered apart from the adequacy of the service, and that the public should not be charged more than the service is reasonably worth. The statute is a legislative recognition of the public's right to demand that consideration be given to the value of the service. (*Covington & L. Turnpike R. Co.* v. *Sandford,* 164 U.S. 578, 596 [17 S.Ct. 198, 41 L.Ed. 560]; *Spring Valley Water Works* v. *San Francisco,* 192 F. 137; see Article, *Value of the Service as a Factor in Rate-Making,* 32 Harv.L.Rev. 516.)

In the final analysis the question whether the right to just

compensation for the service rendered has been denied to the utility depends upon the special facts in the case. (*Minnesota Rate Cases,* 230 U.S. 352, 434 [33 S.Ct. 729, 57 L.Ed. 1511].) Each case must be controlled by its own circumstances. (*Los Angeles Gas & Elec. Co.* v. *Railroad Com.,* 289 U.S. 287, 315 [53 S.Ct. 637, 77 L.Ed. 1180].) Pragmatic adjustments depend upon the particular facts. (*Federal Power Com.* v. *Natural Gas Pipeline, supra.*) It does not appear from the facts in this record that the rate fixed by the commission is so unreasonably low as to call for a declaration that Market Street Railway Company has been deprived of its property without due process of law or without just compensation.

The petitioner asserts some errors in the admission and consideration of statistical and other documentary evidence. It is not the function of the reviewing tribunal in these proceedings to set aside the legislative finding for mere errors of procedure not amounting to lack of due process. Its duty is to ascertain whether the legislative process has resulted in confiscation. (*West* v. *Chesapeake & Potomac Tel. Co.,* 295 U.S. 662, 674 [55 S.Ct. 894, 79 L.Ed. 1640].)

The petitioner objects to the apparent indeterminate duration of the experimental period under the six-cent fare fixed by the commission. The commission still has jurisdiction and if from the monthly reports filed by the company during a reasonable experimental period it appears that the expected increase in passenger traffic on the utility's system due to the reduction in fare and improvement in service does not materialize, the commission has the power to make appropriate adjustments. As the prescribed rate is expressly stated to be tentative, there is no ground for assuming that the commission will reject an application to make such changes as experience may show to be necessary in order to produce the stipulated revenue. (*Clark's Ferry B. Co.* v. *Public Serv. Com.,* 291 U.S. 227, 241 [54 S.Ct. 427, 78 L.Ed. 767].)

The order is affirmed.

Gibson, C. J., Curtis, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.

Petitioner's application for a rehearing was denied July 27, 1944.