## PACIFIC PORTLAND CEMENT CO. v. FOOD MACHINERY & CHEMICAL CORPORATION.

### No. 12054.

United States Court of Appeals Ninth Circuit.

Dec. 2, 1949.

Rehearing Denied Jan. 6, 1950.

Marshall P. Madison, Eugene D. Bennett, Francis R. Kirkham and Wallace L. Kaapcke, San Francisco, Cal. (Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel), for appellant.

Claude N. Rosenberg, Tadini Bacigalupi, Jr., San Francisco, Cal., and Kenneth Ray, New York City (Bacigalupi, Elkus & Salinger, San Francisco, Cal., of counsel), for appellee.

Before DENMAN, Chief Judge, ORR, Circuit Judge, and YANKWICH, District Judge.

YANKWICH, District Judge.

Appellant, Pacific Portland Cement Company, the plaintiff below, is a California corporation. Appellee, Food Machinery and Chemical Corporation, is a Delaware corporation. Its immediate predecessor, the defendant below, Westvaco Chlorine Products Corporation, is a Delaware corporation qualified to do business under the laws of the State of California, with a designated agent in the city and county of San Francisco. Westvaco Chlorine Products Corporation, in turn, was preceded in the contractual relationship with the appellant by California Chemical Company. Because they are so designated in the contract around which this litigation turns, we shall refer to the appellant as Pacific, to appellees's first predecessor as California, to appellee's immediate predecessor as Westvaco, to Food Machinery and Chemical Corporation as the appellee.

In 1930, California constructed at Newark, California, a plant, from which bromine was extracted from bittern, as the sole product of the plant. In 1930, a small plant, designated in the testimony as a "pilot plant," was constructed as an experiment in the production of magnesium from bittern. The experiment continued for a period of two years, at which time various tests were made to determine the quality of the bittern. Many informal discussions were had with Pacific about the product. Samples were submitted to them from time to time. After the quality of the product was deemed satisfactory, negotiations were begun for the execution of a contract. They extended from the middle of 1936 to the date on which the contract was executed—January 29, 1937.

By the terms of the contract, Pacific agreed to purchase all the gypsum produced by California at the Newark, California, plant. The term of the contract was twenty-five years, with the right of Pacific to terminate it at any time *upon one year's notice.* California had no corresponding right. The clause in the contract around which the main controversy centers is clause (6), the "escalator" clause, which reads:

"In the event that California's cost of production of gypsum for any twelve (12) months' period during the term hereof shall increase five per cent (5%) above its average cost of production of gypsum for the preceding (12) months' period, then and in that event California shall have the right, upon giving sixty (60) days' written notice to Pacific, to increase the price payable hereunder for gypsum thereafter delivered hereunder in an amount not to exceed the 'actual advance in California's cost of manufacture'; provided that in no event may more than one such increase be made in any one calendar year."

The contract fixed an initial price of $2.80 per ton. Changes in the price were to be governed by the escalator provisions in clause (6). Three price increases were made by California under this clause. The first one, effective October 5, 1941, claimed an increase of 18¢ per ton in the production cost for the period from July 1, 1940, to June 30, 1941. It brought the initial price up from $2.80 per ton to $2.98. Pacific paid it without objection. The second price increase was to become effective March 15, 1944, but remained inoperative until September 4, 1946, because of wartime control. It was based upon a claimed increase in the cost of production of 78¢ per ton and brought the price per ton to $3.76. The third increase, effective November 13, 1946, claimed an increase in the cost of production of 86¢ per ton for the period of July 1, 1945, to June 30, 1946. This amount,

later reduced to 60¢ per ton, brought the price to $4.36. The last two increases were paid *under protest*.

On March 11, 1947, Pacific began an action for declaratory relief under 28 U.S.C.A. §§ 2201–2202. Its complaint grounded jurisdiction on diversity of citizenship. It set forth a controversy between it and Westvaco over the meaning of clause (6) of the contract. It asserted that under its interpretation of the contract, the last two raises in price were unjustified. It sought a declaration of the meaning of the term "cost of production" in the clause, which would nullify the claimed increases in price, and a declaration as to clause (5)—conformity to specifications. It sought judgment in the sum of $9,405.93, being the total of the two increases paid under protest. Westvaco's answer admitted the existence of the controversy, and pleaded several defenses which no longer concern us here.

After an extensive trial, the court entered its findings and judgment against Pacific on April 26, 1948. Their content, so far as material to this appeal, will be revealed further on in the discussion. On this appeal, the main portion of the judgment which is under attack is that which interprets the meaning of the phrases "cost of production" and "cost of manufacture" in the escalator clause.

## I.

### Some Preliminary Considerations.

In effect, by its judgment, the court declined to limit the cost of production or manufacture to direct costs. On the contrary, it justified all the increases claimed by Westvaco, which included indirect costs such as overhead and the like. It is the contention of the appellant that this finding (1) is not supported by the evidence, (2) is contrary to the intention of the parties as disclosed by the contract, and (3) finds no support in the practical interpretation of "cost of production" and "cost of manufacture" which the parties adopted during the life of the contract and before a controversy arose.

Certain obvious considerations are in order, in view of the nature of these contentions.

As the jurisdiction of the District Court derives from diversity, the meaning of the contract and the rights flowing from it are governed by State law. Angel v. Bullington, 1947, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832; Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 69 S. Ct. 1221; Woods v. Interstate Realty Co., 1949, 337 U.S. 535, 69 S.Ct. 1235. However, as the relief sought is under the Federal Declaratory Judgment Statute, which antedates the enactment of Federal Rules of Civil Procedure, 28 U.S.C.A., and was in force even when procedure was governed by the Conformity Act, 28 U.S.C.A. § 724, the principles which govern Federal declaratory judgments apply in interpreting the proceedings in the court below and the pleadings and actions of the parties. This is important in the present case because of the insistence of the appellant that, in determining the issues, the trial court adopted a wrong view of the burden of proof. This calls for some observations on the subject. Writers have indulged in much speculation about the meaning of "burden of proof." All are in agreement that the only effect of the rule is "the risk of non-persuasion." And the concomitant obligation to go forward in the proof when not met may result in failure to convince the trier of facts. 9 Wigmore on Evidence, 3d Ed., 1940, §§ 2485, 2489; Borchard, Declaratory Judgments, 2d Ed., 1941, p. 404.

In the last analysis, whether we are dealing with an ordinary action or one for declaratory relief, the question of who has the burden of proof is determined not so much by the position of the parties or by choosing *who the actor in the law suit is,* as by the *nature of the relief asked for and granted.* Borchard, Declaratory Judgments, 2d Ed., 1941, pp. 404–409. So far as the Federal declaratory judgment statute is concerned, the matter has been very lucidly stated by the Court of Appeals for the Eighth Circuit in Reliance Life Insurance Co. v. Burgess, 8 Cir., 1940, 112 F.2d 234, 237: "The question as to who must sustain the burden of proof in a declaratory judgment suit is a comparatively new one, which we think does not admit of a categorical answer. It must depend, as in other

classes of litigation, upon the condition of the pleadings and the character of the issues at the time the question is presented. Plaintiff alleged that the insured committed suicide while sane. It alleged an actual controversy, and the proceeding was instituted by it to determine that controversy. Defendants denied that a justiciable controversy existed and put in issue the allegations of plaintiff's petition, but they asked no affirmative relief but prayed only to be discharged with their costs. The question as to whether the burden of proof in its primary sense rests upon the plaintiff or defendant is ordinarily to be determined by ascertaining from the pleadings which of the parties without evidence would be compelled to submit to an adverse judgment before the introduction of any evidence. It is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action. It is generally upon the party who will be defeated if no evidence relating to the issue is given on either side." See, also, California Code of Civil Procedure, § 1981; New York Life Ins. Co. v. Stoner, 8 Cir., 1940, 109 F.2d 874; Mutual Life Ins. Co. v. Tormohlen, 7 Cir., 1941, 118 F.2d 163; Kortz v. Guardian Life Ins. Co., 10 Cir., 1944, 144 F.2d 676; International Hotel Co. v. Libbey, 7 Cir., 1946, 158 F.2d 717, 721.

If the circumstances in this case are tested by this principle, it becomes quite evident that Pacific was an actor in the case. It sought not only an interpretation of the contract, of its rights under it, and a declaration of non-liability, but also relief from asserted overcharges amounting to $9,405.93. It prayed for a declaration that would justify deductions from price by reason of failure to conform to certain specifications. In brief, it sought a declaration which, had it been in its favor, would have relieved it not only of certain charges in the past but would have called for a money judgment in its favor and an interpretation of the contract which would have relieved it, in the future, of increases in price other than those traceable to direct costs. Under the circumstances, it is hard to understand how it can be urged that the appellant merely brought the appellee into court for the purpose of having it show affirmatively that *it was* entitled to the periodic increases.

At the trial, the appellant did not rely merely upon the textual meaning of the contract. For days it directed testimony to the negotiations which lead to its execution. It did this in support of its interpretation of the meaning of the phrases "cost of production" and "cost of manufacture." It offered in evidence documents such as Exhibit 5, from which it sought to draw the inference that only direct costs were in the contemplation of the parties when the contract was made. When to this we add the evidence of experts as to the propriety of allocating overhead to the cost of production of a by-product and evidence relating to the practical interpretation placed by the parties on the contract after its execution,—it is idle to insist that the burden of proof was not upon the appellant. If it was not, the appellant certainly spent many days proving a negative. We must assume that experienced counsel will not adopt such trial tactics unless they are of the view, and *desire to give the impression to their opponent and to the court,* that they are going forward with evidence which it is their duty to produce. And, having done so, they cannot very well insist that, in reality, they assumed a burden which was not theirs. As said by the Supreme Court of New Hampshire in Hartford Accident & Indemnity Co. v. Lougee, 1938, 89 N.H. 222, 196 A. 267, 269:

"It voluntarily assumed the ordinary position of a plaintiff in opening the case and accepted the order for its closing. It thereby assumed the burden of proving it had not insured the defendant instead of requiring that action be taken in assertion of the claim of insurance. Travelers Ins. Co. v. Greenough, 88 N.H. 391, 393, 190 A. 129, 109 A.L.R. 1096. It sought to make out a case of nonliability rather than to defend against a claim that it was liable. The trial was conducted with this apparent understanding by the court and all parties. It would be unfairly inconsistent for the

plaintiff to take the advantages of the order of proceeding in the trial without submitting to the normally attendant burdens.

"In Travelers Ins. Co. v. Greenough, supra, the only question raised was the result of a finding of equally balanced conflicting evidence on a decisive issue. The procedural course of the trial was not presented as a matter affecting the burden of proof, and the proper rule of the burden was therefore considered without regard to the order of introducing evidence. Here the question is whether the benefit of the rule was waived or lost by a course of the trial not only accepted without objection but apparently assumed as a matter of right."

The trial judge did refer, on occasion, to the burden of proof. But there is no showing that, during the trial of this case, at any time or as to any of the matters in issue, he found himself confronted with that hypothetical situation of "evidence evenly balanced," which calls for a decision against the party having the burden of proof. His findings and conclusions of law are explicit. They do not indicate that he resolved any conflict upon the basis of that theoretical situation.

So, the problem before us, as a reviewing court, is not the intricate ratiocinations by which the result, of which appellant complains, was arrived at, but whether it is supported by the evidence and correct in law. For the trial judge speaks to the reviewing court through one means only, i. e., *through his findings and judgment.*

And the question before us, in this— as in all other cases in which findings are required—is whether they are supported in the record.

 As to this, we are faced with the mandate of Rule 52(a) of the Federal Rules of Civil Procedure, which bids us not to set aside findings unless they are "clearly erroneous." Federal Rules of Civil Procedure, Rule 52(a). Under the interpretation which the Supreme Court, and this and other courts of appeal, have placed upon this section, the findings of a trial judge will not be disturbed if supported by

substantial evidence. Full effect will always be given to the opportunity which the trial judge has, *denied to us,* to observe the witnesses, judge their credibility, and draw inferences from contradictions in the testimony of even the same witness. Savage v. Lorraine, 9 Cir., 1945, 148 F.2d 818; Augustine v. Bowles, 9 Cir., 1945, 149 F.2d 93, 96; Lincoln National Life Ins. Co. v. Mathisen, 9 Cir., 1945, 150 F.2d 292, 295–296. This is the meaning of the provision that findings should not be set aside unless clearly erroneous. Grace Bros. v. Commissioner, 9 Cir., 1949, 173 F.2d 170, 173–174. In contrast, the Supreme Court has told us that, "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

 As a corollary to this rule, we may make our own inferences from undisputed facts or purely documentary evidence. For, to use the colorful language of the Court of Appeals for the Third Circuit, the rule does not operate "to entrench with like finality the inferences or conclusions drawn by the trial court from its fact findings." Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 1941, 119 F.2d 704, 705. And see Western Union Tel. Co. v. Bromberg, 9 Cir., 1944, 143 F.2d 288, 290; Home Indemnity Co. v. Standard Accident Ins. Co., 9 Cir., 1948, 167 F.2d 919, 922, 923.

It follows from what precedes that, in view of the situation which confronted the trial court in this case—the issues as framed and assumed by the parties in the conduct of the trial—there is brought before this court in this, as in every similar case, the problem whether the findings and judgment find support in the record.

## II.

### The Interpretation of the Contract.

 It may aid in the solution of the problem if we state, generally, our understanding of the position taken in this court

by the appellant. As we view the situation, the ultimate problem before the trial court was whether the contract, by its plain language, tells what "cost of production" or "cost of manufacture" *means* or *does not mean*. If it does so tell us, then neither the trial court nor ourselves need resort to anything outside the contract itself to determine the true meaning of the phrases. If we do this, we may reach a different conclusion from that reached by the trial court. See Kuhn v. Princess Lida of Thurn & Taxis, supra. If, on the other hand, the language of the contract is not plain, two situations may present themselves: (1) the contract may contain technical or trade terms, as to which the testimony of those skilled in the art or experts in the field is admissible, or (2) the contract may contain ambiguities which need extrinsic facts to explain. Whichever of these situations confronts us, its solution, on appeal, brings up the same question—is there evidence in the record from which different conclusions might have been reached? If so, it cannot be said that the conclusion reached by the trial court is clearly erroneous.

An examination of the record discloses the fact that upon the fundamental issue, namely, the meaning of the phrases "cost of production" and "cost of manufacture" in clause (6) of the contract, both sides produced evidence, through lay persons and experts, from which different inferences and conclusions might have been drawn. There is no need to review in detail the extensive record which we have read. The point we are making will become apparent from an analysis of the testimony given as to the negotiations which preceded the signing of the contract.

Two persons conducted the negotiations—James H. Colton, Vice President, on behalf of Pacific, and Stanley H. Barrows, President, on behalf of California. The conversations, correspondence—every step leading to the consummation of the contract—were between these two men. Colton stated that, at no time, was it suggested that any price increase "should be based on any items other than direct costs of the manufacture of gypsum." To support this

view, appellant, before Colton testified, offered in evidence Exhibit 5—a letter written by Barrows to Colton under date of June 5, 1936, *almost seven months before the final execution of the contract,* outlining suggestions for a proposed contract. Some eleven proposals were included. They are referred to in the letter as "a few of the conditions upon which we have done some preliminary work." Proposal 11 reads: "11. Contract would contain certain price protection clauses to guard against increases in labor, fuel and supplies, some moderate minimum payment in order to keep the contract alive in depression or competitive siege, privilege of cancellation by us on fifteen-month written notice, together with the many other features not intended for preliminary contemplation."

This letter was introduced over the objection of the appellee, which the court overruled. In urging its admissibility, counsel for the appellant stated:

"I think it is perfectly clear this letter is admissible. I need not discuss the parol evidence rule with Your Honor. That rule is that if a term used in a contract is perfectly clear and free of any ambiguity, the Courts usually do not go beyond the contract itself for an interpretation, that is, the term as used in the context in relation to the purpose and objects of the contract, as used in the particular sense and way in which it was used.

"On the other hand, if there is question as to the meaning of a term, in this case in the escalator clause providing a right of the defendant to increase its price upon an actual—I quote the words of the contract —'an actual cost of production,' 'cost of manufacture,' terms used in the contract, of this byproduct gypsum, counsel says for the defendant that it is ambiguous. He goes so far as to say that it is ambiguous, that the contract is invalid; but he says if it is not that far, at least it means all costs, every cost, indirect overhead as well as the direct costs. We have shown to Your Honor not only by my statement, but the testimony of this witness, that we have taken the view all along that these terms, cost of production and actual advance in the cost of manufacture of this byproduct gyp-

sum, *intends and should be limited to the actual or direct cost of the manufacture. That is the principal issue in this case. If there is a question of ambiguity, as counsel asserts, or if there is a question of whether these words were intended to mean and should be construed to mean all embrasive, every possible conceivable cost, or should be narrowed to the actual increase in cost of production and that escalator clause is concerned, then under the undisputed rules of evidence, parol evidence, attending circumstances showing what the parties were talking about and intended, is admissible.* It is an aid to the Court in interpreting that clause." [Emphasis added.]

It is quite apparent that the grounds for offering this testimony fit exactly into the problem as we stated it. The appellant endeavored to draw from the proposal which accompanied the letter support for its interpretation of the clause under discussion. The appellee met the issue squarely. They put Barrows on the stand. Through him they offered and caused to be received in evidence Defendant's Exhibit H. This was a letter addressed by Barrows to Colton under date of September 18, 1936— *more than three months after the preliminary letter of June 5, 1936.* Accompanying this letter was a more specific form of agreement. It contained the following clause: "6. The prices hereinabove stipulated to be paid by Pacific for gypsum, quicklime and hydrated lime are based upon the average direct cost to California to produce the materials covered by this agreement during the first year's operation of the contemplated new plant proposed to be erected at Canal Head, Newark, California,. and it is therefore understood and agreed that in the event of price advances and labor, transportation, fuel or supplies resulting in an increase of 5% or more in cost above the first year's average direct cost hereinabove referred to, f. o. b. cars shipping point, then and in that event California shall have the right to increase the price to Pacific to the extent of the increase above the said average direct production cost for lime or gypsum."

This clause was the precursor of clause (6) in the final contract. In this form, it tied the increase in the price of gypsum to price advances in labor, transportation, fuel and supplies. In his oral testimony Barrows gave the clue to the disappearance of the clause. We quote from the record:

"Q. Tell us as near as you have a recollection of what was said during that period of time in relation to it. A. The discussions came down to conditions referring to production, cost of production, items of production cost. During this discussion I said, 'Well, that is not sufficient, just the items.' I said, 'I wouldn't be limited to those items, there are other items that go to make up cost of production,' and we argued. I mentioned a number of items. He said, 'We can't put all these items in.' I said, 'If we can't do that, then make it the cost of production and we will let the accountant decide what cost of production is.' That was the point of the conversation.

"Q. You said to Mr. Colton you would not want to be limited to those particular items. What items do you refer to? A. Well, I think we put in tentatively at the start—that letter, I believe, of the 25th mentions a few items.

"Q. Do you recall the items that you mentioned? A. No, I couldn't recollect that.

"Q. Exhibit 5. A. They were not sufficiently clear for a long-term uncancellable contract.

"Q. What was Mr. Colton's response to that? A. I can't relate his response, but it wound up in him saying, 'Well, we will just put in cost of production and let it go at that. Cost of production, I presume; I don't know.

 * * * * * *

"Q. Was there anything else there discussed on this subject between you and Mr. Colton? A. I recall myself suggesting that it be termed cost of production as according to accounting standard practice and I left a note of that before they completed the final contract to Mr. Williams explaining it and that was not put in. Whether I gave him the note or not I don't know, but that was definitely stated.

"Q. Between the time that you wrote this letter of September 18, 1936, and

January 29, 1937, were there any redrafts of the agreement in the interim? A. Yes.

"Q. What would occur when these redrafts would be prepared? A. Well, Mr. Colton would scratch, make notes on his copy and I would do the same with mine and we would have a meeting to iron out the items under discussion or approving the items under discussion.

"Q. Do you have any recollection of any further conversation with Mr. Colton on the subject of cost of production following December or is the last conversation? A. I think that was the last one.
* * *

"Q. Will you state your best recollection of what was said in that respect? A. I don't know how to put it in more or less words. We discussed the thing and decided on the terminology, namely, we will have cost of production control that part of the clause that was in our discussion and you will come to an agreement when you decide to put something in.

"The Court: When you put it in language you come to an agreement, that is a conclusion. You can't spell anything out. Under the law they are entitled to as near as you can relate the conversation had at that time and place, any of it or all of it or what you have a recollection of. A. Well, I can't relate that specific conversation ten years back.

"The Court: I am not asking you to.

"The Witness: I mean, I am answering, I could not tell the words that were used; it is just impossible.

"Q. Can you give us the substance of what was said? A. I think I have already done that.

"Let's do it again. Who suggested the language, cost of production, do you recall? A. No, I don't. I think we both decided that would cover what we were driving at, the cost of production of gypsum.

"Q. In the course of those conversations was it said by either you or Mr. Colton that is the language we will put in the contract? A. Yes.

"Q. Did the other party acquiesce and say that would be all right?
* * * * * *
"The Witness: Verbatim."

Upon issues clearly joined, divergent views of the negotiations leading up to the contract and supporting documents were called to the attention of the court. The fundamental issue around which the case turned was the meaning of the phrases "cost of production" and "cost of manufacture." If the court adopted the view expressed by the appellant and took the statements in the embryonic clauses, which accompanied the letter of June 5, 1936, and of the more formal proposed contract of September 18, 1936, as indicating that direct costs only were to be considered in determining increases, it could have reached the conclusion that appellant's interpretation is correct. But the Court evidently took Barrows' explanation of the elimination of the clause and reached the conclusion that the contract was not to contain any detailed analysis of the elements going into the cost of production or manufacture, and that the words in clause (6) were used in the ordinary sense in which businessmen and accountants used the term and the increases were to be calculated on that basis. This meant that the meaning of "cost of production" and "cost of manufacture" was to be determined by ordinary business and accountancy methods. And both sides met this issue by presenting elaborate testimony as to the meaning of the terms and as to the elements which go to constitute "cost."

### III.

The Law of Interpretation of Contracts.

The rather lengthy narration of facts, with ample references to the record, serves to emphasize the fact that the primary matter before the court was the interpretation of the contract. This was the issue made by the pleadings, to which the major portion of the testimony was directed. In order not to break the continuity of the narrative, we omitted any reference to the legal principles which underlay the procedure followed in this case, other than to assume that it conformed to the law. We

now refer to certain principles governing the interpretation of contracts, and their bearing upon the problems presented on this appeal.

■ It is the aim of courts, in interpreting a written contract, to give effect to the mutual intention of the parties as it existed at the time of the execution of the contract. This is a primary rule of construction, generally recognized and embedded in California law. 17 C.J.S., Contracts, § 295; California Civil Code, §§ 1636, 1638; California Code of Civil Procedure, § 1859; Restatement, Contracts, §§ 226, 233; Lemm v. Stillwater Land etc. Co., 1933, 217 Cal. 474, 480-481, 19 P.2d 785.

■ In applying this norm, courts will interpret words in the sense in which they are ordinarily used, except when they are used in a special or technical sense. 17 C.J.S., Contracts, §§ 301-304; California Civil Code, §§ 1644, 1645; California Code of Civil Procedure, § 1861; Restatement, Contracts, § 235; 3 Williston on Contracts, Revised Ed., 1936, §§ 607, 614; California Canning Peach Growers v. Williams, 1938, 11 Cal.2d 221, 78 P.2d 1154, 1157-1159; Turner v. Metropolitan Life Ins. Co., 1943, 56 Cal.App.2d 862, 133 P.2d 859, 861-862.

The principle has been summed up very succinctly by Judge Learned Hand in New York Trust Co. v. Island Oil & Transport Corp., 2 Cir., 34 F.2d 655, 656:

"It is quite true that contracts depend upon the meaning which the law imputes to the utterances, not upon what the parties actually intended; but, in ascertaining what meaning to impute, the circumstances in which the words are used is always relevant and usually indispensable. The standard is what a normally constituted person would have understood them to mean, when used in their actual setting."

■ In seeking light on the meaning of words used in a contract, prior negotiations and surrounding circumstances may be considered. California Civil Code, § 1647; California Code of Civil Procedure, § 1860; Restatement, Contracts, § 235(d), comments e, f and g; Williston, op. cit., § 629; California Canning Peach Growers v. Williams, supra.

■ The aim, as Williston has put it, is not "primarily the intention of the parties which the court is seeking, but the meaning of the words at the time and place when they were used." Williston, op. cit., § 613, p. 1764.

■ In this manner, a meaning peculiar to the parties may be given to words if they actually express it. Restatement, Contracts, § 231, illus. 3; Williston, op. cit. § 613, p. 1761.

Some illustrations taken from California cases may serve to indicate how these principles are applied to particular situations. The word "children" as used in the beneficiary clause of an insurance policy may be interpreted to include illegitimate children, although the technical, common law meaning of the word excludes illegitimate children. Turner v. Metropolitan Life Ins. Co., supra.

The use of the words "child" and "children" in a property settlement agreement presents a question of fact whether they are used for descriptive purposes only or imply an undertaking to support them during the entire period of minority. The issue thus presented is whether the words were "intended as terms of description or of limitation." Walsh v. Walsh, 1941, 18 Cal.2d 439, 116 P.2d 62, 65.

The word "transaction" used in a contract for the dissolution of a real estate partnership, which called for a commission to be paid when any transaction leading to a commission was closed, may be interpreted to imply something more than a particular sale, lease or contract. And, because of the broad meaning of the word "transaction," evidence may be resorted to to show the dealings to which the partners had reference. Wachs v. Wachs, 1938, 11 Cal.2d 322, 79 P.2d 1085.

Where a trust deed extension agreement provided for transfer "by way of a pledge" of possession of certain furniture on the mortgaged premises, evidence was held admissible to show that the intention was to merely transfer the use of the personal property in connection with the real property and that the personal property was not to be "pledged as additional security for

the debt." Ross v. Pacific Mortgage Guaranty Co., 1936, 16 Cal.App.2d 672, 61 P.2d 368, 369.

In all these cases in which—as a result of uncertainty relating to the intention of the parties or the meaning of the words used—testimony was received, the reviewing courts adopted the view of the trial court. They treated a finding in favor of one rather than another of the divergent interpretations which were urged upon the trial court as a finding of fact. In Ross v. Pacific Mortgage Guaranty Co., supra, the court used this language: "These conclusions were upon questions of fact and while they relate to the intentions of the parties they have the same controlling force upon this appeal as though they were findings concerning the acts of the parties. The construction of an uncertain or ambiguous agreement by the trial court after the taking of oral evidence in aid of its interpretation must stand unless it is without support in the evidence."

In adopting this attitude, the courts follow consistently the views already discussed in the first portion of this opinion, that the conclusion of the trial judge, based on conflicting testimony or on reasonable inferences drawn from admitted facts, should not be disturbed. Even straight interpretation, unaided by extrinsic evidence, is subject to a modified form of this rule.

■ Ordinarily, it is said that a trial court's interpretation of a contract is not binding on appeal; that the appellate court may make its own interpretation. Brant v. California Dairies, 4 Cal.2d 128, 48 P.2d 13; Wall v. Equitable Life Assur. Society, 1939, 33 Cal.App.2d 112, 91 P.2d 145; Kuhn v. Princess Lida of Thurn & Taxis, 3 Cir., 1941, 119 F.2d 704, 705. Nevertheless, the reviewing courts attach weight to a trial court's interpretation and will follow it if it is reasonable and "will not substitute another interpretation, though it seem equally tenable." Kautz v. Zurich etc., Ins. Co., Ltd., 212 Cal. 576, 582, 300 P. 34, 37; McNeny v. Touchstone, 1936, 7 Cal. 2d 429, 435, 60 P.2d 986, 989; Universal Sales Corp. v. California Press Mfg. Co., 1942, 20 Cal.2d 751, 772, 128 P.2d 665; In re Rule's Estate, 1944, 25 Cal.2d 1, 11, 152 P.2d 1003, 1008, 155 A.L.R. 1319. In the latter case, this principle is stated in this language: "The rule is that an 'appellate court will accept or adhere to the interpretation [of a contract] adopted by the trial court—and not substitute another of its own—* * * where parol evidence was introduced in aid of its interpretation, and such evidence * * * is such that conflicting inferences may be drawn therefrom.' * * * Certainly inferences may be drawn from the contract and the surrounding circumstances here which would support the finding which we must presume was made by the trial court relative to the intention of the contracting parties."

## IV.

### "Cost of Production" as a Question of Fact.

■ If the principles just discussed are applied to the facts in this case, it becomes quite apparent that the fundamental problem of interpretation presented a *question of fact,* which the trial court resolved against the appellant. We have already discussed the divergent views as to the meaning of "cost of production" and "cost of manufacture," which arose from the testimony relating to the negotiations preceding the execution of the contract. The expert testimony relating to the meaning of the terms created a like conflict. The conclusion which the trial court drew from this testimony was expressed in paragraph 2 of its conclusions of law, in these words: "2. That the terms 'cost of production' and 'cost of manufacture' as used in paragraph (6) of said contract are synonymous and are not limited to 'actual' or 'direct' costs; that said terms 'cost of production' and 'cost of manufacture' include overhead expense and indirect charges which cannot be directly charged to or against each of the various products produced by defendant at its Newark, California, plant, and which must, therefore, be allocated to or apportioned among such products on some reasonable basis."

The discussion which precedes makes it evident that on the main question involved in this appeal, we have an issue framed and decided by the trial court upon contra-

dictory testimony, both lay and expert, with ample evidence in the record to support the view adopted by the trial court. Indeed, we take it, that the position of the appellant is that if the interpretation which the trial court adopted is grounded on fact, there is conflict in the testimony. The appellant insists, however, that because the contract refers to gypsum as a "by-product," the interpretation which the trial court placed upon the words "cost of production" and "cost of manufacture" is erroneous. The answer to this contention is that there is evidence in the record that the view, which allows indirect costs (overhead) as a part of the "cost of production," is sanctioned by accounting experts, *whether we are dealing with a main product or a by-product.* So, as to this point also, the trial court resolved a conflict and its interpretation should be sustained, because it is not unreasonable. There is also the added fact that the persons who negotiated and executed the contract, while skilled in the managerial fields which they occupied, were not expert accountants, certified or other. So, when they used the word "by-product" in designating gypsum, they did not intend to endow it with all the specific meanings, and their implications, which experts in accountancy give to it. They merely meant to describe it as a product, the manufacture of which is not the main object of a particular manufacturing process, but is incidental to, and derivative from, it.

Under the circumstances, the trial court was right in declining to make a finding which would have characterized gypsum as a "by-product," so as to attach to it all the incidences of accountancy which the appellant's experts sought to fasten to it. In paragraph 2 of its findings of fact, the court found: "The Court makes no finding as to whether or not, gypsum, as produced by defendant at its Newark, California, plant, is a by-product for the purposes of this action, for the reason that the Court finds as a fact that in determining the cost of production of a by-product which requires an independent physical plant, and independent labor to be performed upon it, in order to convert it into a marketable product, as does the gypsum produced by defendant at its Newark, California, plant, good accounting practice requires the inclusion of 'overhead expense' and 'indirect charges,' as said terms are hereinafter used."

In the light of the special circumstances in the case, this interpretation is not unreasonable. Consequently, even if the court had not been aided by extrinsic contradictory testimony, *both lay and expert,* its conclusions should command assent.

A similar deduction is warranted if we consider the conduct of the parties subsequent to the execution of the contract and before the controversy arose. Such conduct is given due consideration in determining the meaning of a contract, because it may indicate the actual, practical construction which the parties have placed upon the contract. 17 C.J.S. Contracts, § 325; Restatement, Contracts, § 235(e); Retsloff v. Smith, 1926, 79 Cal.App. 443, 452–453, 249 P. 886; Tennant v. Wilde, 1929, 98 Cal.App. 437, 277 P. 137; Universal Sales Corp. v. California Press Mfg. Co., supra.

The fact that the first increase was not objected to, that when the first "breakdown" of the claimed increase of 18¢ was asked for, a statement was sent under date of October 2, 1941, in which 15¢ of the increase represented direct costs (designated as "labor, power and material costs") and was accepted, *without protest,* and other facts—such as the indication that the statement just referred to was preceded by a conference between the representatives of the parties (where the appellee's books may have been available for checking)—that, although the letter which accompanied the statement offered to furnish *"further information in re the attached statement,"* none was demanded, and the fact that the allocated taxes and insurance —*which are clearly indirect costs*—were never objected to, warranted the finding that the interpretation which the parties themselves placed upon clause (6) of the contract accorded with the views finally adopted by the court.

## V.

### Specific Objections.

The preceding discussion leads to the conclusion that the trial court determined the meaning of clause (6) of the contract correctly when it decided that indirect costs were part of the cost of production or manufacture.

In addition to what has already been said, the observation is in order that indirect costs are just as much a part of the cost of production or manufacture of gypsum, under the present contract, as they are a part of the cost of extraction of gasoline from dry gas under an oil lease. See Meyers v. Texas Co., 1936, 6 Cal.2d 610, 59 P.2d 132, 136.

And now to the specific items objected to and allowed by the court:

1. General and Administrative Expenses.

In the case of corporations operating on a large scale "it is considered legitimate accounting practice to allocate general overhead expenses to particular operations upon a percentage basis." United States v. Standard Oil Co., D.C.Cal.1937, 21 F. Supp. 645, 656; Standard Oil Co. v. United States, 9 Cir., 1940, 107 F.2d 402, 419.

█ And there is evidence in the record that such allocation on a percentage basis is good accounting practice, even when dealing with a by-product. Indeed, in the case just cited, some of the added expense resulted from the establishment of a compressor and absorber plant for the purpose of adding to the production of dry gas, incident to the production of oil and wet gas. Yet this Court saw no difficulty in sustaining the trial court which treated the cost as an incident of production and operation.[1]

If there be any element of unfairness in the matter of administration costs, it results merely from the fact that the appellant is dealing with a corporation operating on a large scale. But, as consolidation and merger are everyday incidents in our industrial life, the possibility of a large concern succeeding a local one should have been envisaged when the contract was entered into. The appellant knew also that there had been no prior production at the Newark plant upon which production costs could be calculated.

So it must have, or should have, known that some general, hypothetical allocation on a percentage basis would be resorted to.

█ Having dealt with the appellant's predecessors under these conditions, the appellant cannot be heard to say *now* that it is unfair to allocate to a by-product part of the general administrative costs of a manufacturing process, of which the by-product is a part.

Otherwise said, the answer is that of one of Molière's famous characters, Tu l'as voulu, Georges Dandin. (Thou hast willed it.)

So, the solution of the matter by the trial court is consonant with ordinary human experience, as it is also with business and legal practices in matters of this character.[2]

2. New Products Research.

The appellee carried on research, as a part of its operations. As the production of gypsum is an integral part of a larger process of manufacture in which the appellee is engaged, any research which might result in the discovery of new products or new uses for known products, would increase the number of products among

1. "It is a matter of common knowledge that all well-managed manufacturing businesses recognize overhead costs as financial outlays expended in the production of an article or process. * * * There is probably no single phase of determining cost of manufacturing a device or machine which is more elusive or difficult than the allocation of overhead to a particular article. The impossibility of precise allocation is generally recognized and the law is not so exacting as to require a delicately balanced scientific method of determination, which reaches a mathematical certainty." Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 1943, 133 F.2d 487, 500.

2. It should be added that taxes and insurance—which are concededly indirect charges—have never been objected to by the appellant.

which the cost of production should be distributed. In which event, the appellant's share would be reduced proportionately.

■ There is accounting testimony justifying the allocation of a portion of this cost to gypsum.

That all such allocations may involve a speculative element does not stand in the way of their acceptance as a proper business practice.[3] And this is especially true when it is borne in mind that any new discovery might affect the entire process of manufacture, which, in the main, is as follows:

The bittern from which bromine is extracted is the liquid remaining after salt companies have precipitated salt from sea water. It is purchased by appellee from salt producers who deliver it to storage ponds. As it is withdrawn from the storage tanks, sulphuric acid is added to the raw bittern. The bittern thus neutralized flows into bromine separation towers where the bromine is removed. The neutralized bittern, with the bromine removed, contains magnesium chloride and magnesium sulphate. In order to remove the sulphates, calcium chloride is added. A precipitation occurs, and the precipitate, when separated, dried and ground, is gypsum.

3. Indirect Shipping and Compressor Charges.

As the result of a change in accounting methods, two cents per ton were added to the shipping charges and one cent to the compressor charges. In this manner, a prior allocation of 20 per cent of shipping and compressor charges to gypsum as against 80 per cent to other products, was changed to an allocation of 50-50.

*(a) The Shipping Charge.*

The addition of two cents per ton to the shipping charge was the result of a change in the method of computation from a *value* to a *tonnage* basis. Back of the change lay the conviction,—expressed by the office manager of Westvaco, an accountant by profession,—that "the truth of shipping is the tonnage that is shipped. You can't get any closer to the truth. * * * Shipping expense on any other basis than the tonnage basis was absolutely and basically wrong."

Otherwise put, as the price of gypsum was low, it was believed that shipping charges based on value did not apportion to gypsum its correct proportionate share. The change sought to correct this situation. However, there is the undisputed testimony of the same witness that, while the earlier method of accounting was wrong, there had, *in fact,* been no increase in the cost of the year 1945 over the prior cost. Indeed, he admitted that "no greater burden was placed on that product (gypsum) in 1945 than before."

■ So, granting—to use the same witness' phrase—that "the supervision charge in previous years had been wrong", the change in method did not call for an increase for the year 1944. The accounting method of the later period should have been applied to the figures of the earlier period to determine the difference, if any,

3. As the Court of Appeals for the Sixth Circuit has put it in Gordon Form Lathe Co. v. Ford Motor Co., supra, "The cost of manufactured products consists of the sum of direct costs, that is, direct material and direct labor, plus indirect costs, or manufacturing expense. Because of its indirect and general nature, manufacturing expense cannot be charged directly to each production order as can direct material and direct labor. It must therefore be distributed over production in such manner that each kind of product and each lot of work produced will be charged with its fair share of the indirect expense.

"The direct labor and time cost method of distribution of manufacturing expense used by the Master is based on the theory that the relationship between manufacturing expense and the direct labor cost incurred and time consumed in production are so related that by the use of this method the manufacturing cost will be fairly distributed over the entire output and may be allocated to each item with reasonable certainty. This method is widely used by manufacturers and gives very satisfactory results if the percentage is properly predetermined. Lawrence on Cost Accounting, Prentice Hall, ch. 15, pages 216 to and including 231. There is no issue raised here as to the correctness of the percentages."

of the costs in the two periods. Had this been done, and had the accounting method for 1945 been applied to the prior year 1944, nothing was due on this item for 1945. Recovery should, therefore, have been allowed for the moneys paid under protest on this item.

### (b) The Compressor Charge.

The added compressor charge of one cent was made after a detailed study which resulted in allocations based on the times during which the compressor was used in the handling and production of the various products, including gypsum. Prior to this, the compressor charge was included as overhead and was allocated to some products which, according to the same witness, "had no benefit at all from the compressor."

The object of the change was to abondon what was considered an unequal method for one which apportioned this expense in a manner corresponding more nearly to the benefits from the particular operation. Concede that,—the appellant, having received in previous years, the benefit of undercharges,—the new method restored the balance by equalizing the benefits, nevertheless, the change resulted in an increased charge for the particular year, despite the fact that there had been no actual increase in the cost for that year. And the contract between the parties made increased cost a condition precedent to any increased charge.

The trial court was, therefore, in error in disallowing recovery on these charges.[4]

### 4. Depreciation Charges.

The appellee, in charging depreciation, used what is known as the "straight line method", by which the cost of equipment is charged off in annual amounts over its estimated life. The appellant admits that this method is "concededly a common one." It insists, however, that its use in the present case is not justified because "this meth-

od does not reflect the actual wearing out of the machine". But there is expert testimony in the record that the time element is the only true measure of depreciation of a gypsum plant. Corrosion is the predominant cause of depreciation. It attacks normally the machines in a chemical plant regardless of the amount of production. It is true that the Supreme Court in McCardle v. Indianapolis Water Co., 1926, 272 U.S. 400, 416, 47 S.Ct. 144, 150, 71 L.Ed. 316, has condemned "mere calculations based on averages and assumed probabilities." But, it is to be borne in mind that the case in which the phrase was used was a rate case. The Court was confronted with the valuation of a public utility approved by a State Public Service Commission for rate-making purposes. It appeared that the Commission's deduction was not "based on an inspection of the property." To the contrary, there were other estimates by experts "based on actual inspection and a consideration of the probable future life as indicated by the conditions found." In view of this, the Supreme Court, exercising the great power which it has in reviewing actions of State rate-fixing bodies, held that the Commission should not have used the "straight line method." And the Court used this language: "The testimony of competent valuation engineers who examined the property and made estimates in respect of its condition is to be preferred to mere calculations based on averages and assumed probabilities. The deduction made in the city's estimate cannot be approved."

In its proper context, the phrase on which the appellant relies is not a condemnation of the "straight line method" when adopted by a trial court after experts, whom it chooses to follow, characterize it as proper under the circumstances. Indeed, since the decision in the case, Federal courts have, nonetheless, approved "straight line" computations in rate cases. See, Colorado Interstate Gas Co. v. Fed-

4. While the money equivalent of these increases for the particular year is not great, the contract, as to which the declaration was made, will not expire until

January 31, 1962. And we should not sanction sudden or sporadic increases due to changes in accounting methods that might result in unjust gains.

eral Power Commission, 10 Cir., 1944, 142 F.2d 943, 960. And the Supreme Court in a later case has intimated that what it intended to condemn was "[the] rough and ready approximation of value." West v. Chesapeake & Potomac Telephone Co., 1935, 295 U.S. 662, 679, 55 S.Ct. 894, 901, 79 L.Ed. 1640.[5]

■ So the problem before us cannot be solved by resort to general statements of the type adverted to. And in this, as in other matters here under discussion, we cannot say that the Court's finding is "clearly erroneous", when the matter was one of choosing between two contending theories of accountancy.

5. The Sulphuric Acid Charges.

In the process of manufacture which we have described (subdivision (2) of this portion of the opinion), the function which sulphuric acid plays in the production of bromine was shown. When the appellee was producing bittern, no part of the sulphuric acid cost was allocated to gypsum. Bromine absorbed it all. But, when bromine was discontinued, the sulphuric acid was charged to gypsum because its use was necessary to the precipitation which produced gypsum. So, if the whole cost is now allocated to gypsum, the appellant benefited by the omission of *all charges* when bromine was produced. Balance is now restored. And, as the change is not arbitrary, but flows from the process of production, changes in that process are properly reflected in the allocation of the costs.

■ So, the conclusion of the trial court on this matter should not be disturbed.[6]

## VI.
### Conformity to Specifications.

One other matter requires consideration. Paragraph (5) of the contract reads: "(5) In the event that any gypsum ($CaSO_4.2H_2O$) tendered to Pacific hereunder shall not be within two per cent (2%) in gypsum ($CaSO_4.2H_2O$) content of, or if it shall not conform to, the chemical analysis and specification attached hereto, marked Exhibit "A," and hereby made a part hereof, then and in that event Pacific shall have the option as to any gypsum ($CaSO_4.2H_2O$) either to (1) refuse to accept and pay for such gypsum ($CaSO_4.2H_2O$), or (2) accept such gypsum ($CaSO_4.2H_2O$) and pay therefor ten cents (10¢) per ton less than the price provided for in paragraph (4) above for each per cent which the said gypsum ($CaSO_4.2H_2O$) falls below the said chemical analysis in gypsum ($CaSO_4.2H_2O$) content."

This clause patently gives to the appellant the right to reject gypsum if it does not meet the specified standard of quality, but it provides no method of testing or sampling. For nine years the appellee's predecessors took and furnished to the

---

5. And see the comments of the Supreme Court of California on the McCardle case, supra, in the light of later decisions, in Market St. Ry. Co. v. Railroad Commission, 1944, 24 Cal.2d 378, 391–397, 150 P.2d 196, 204–206.

6. In concluding this portion of the opinion, it may not be amiss to refer to the complex problems which modern cost accountancy presents to a court called upon to determine values or costs. Gordon Form Lathe Co. v. Ford Motor Co., 6 Cir., 1943, 133 F.2d 487, 499, lists thirty-one items which large corporations charge under "overhead." They are: "Administrative salaries; depreciation of land improvements; depreciation of buildings; depreciation of machinery; depreciation of durable tools; depreciation of factory and miscellaneous equipment; depreciation of freight car equipment; depreciation of locomotive equipment; depreciation of power equipment; insurance; experimental engineering and designing; moving and re-arranging department; factory supervision; final inspection; miscellaneous manufacturing expense; power operations; repairs to land improvements; *repairs to buildings*, fixtures and structures; repairs to machinery; repairs to durable tools; repairs to factory and miscellaneous equipment; repairs to freight car equipment; repairs to locomotive equipment; repairs to power equipment; expense of tools; insurance (employees' liability and compensation); sweeping and cleaning; taxes (state, city and county); *miscellaneous* services for employees; timekeeping, pay rolls and factory clerical salaries."

appellant samples of each carload. About a year before the trial, the method was changed to a composite sample representing a week's production or approximately twenty carloads. The pleadings tendered an issue on the subject. The trial court determined that a composite sample of the aggregate quantity of gypsum shipped "in the course of a 24-hour day" was a proper method of sampling. It found that such aggregate was a "shipment" under the contract.

There was testimony by a chemist employed by the appellee that either the daily or weekly composite was "a fair criterion of the general quality of the output." As the clause under discussion provided *no* method of sampling, the appellant acquired no vested interest in the single car method. Cf. 17 C.J.S., Contracts, § 325, pages 763, 764. The trial court was free to choose a method which it deemed "a fair and proper criterion of the gypsum delivered by defendant under the contract." In so doing, it exercised its power of interpretation. The result not being unreasonable and the construction being "tenable," we should not reject it. (See cases cited under Part IV of this opinion, especially McNeny v. Touchstone, 1936, 7 Cal.2d 429, 435, 60 P. 986, 989.[7]

From what precedes, it follows that there is substantial testimony in the record to sustain all the challenged findings of the trial court and the judgment which it entered in the case, except in so far as they denied the appellant recovery of the indirect shipping and compressor charges paid.

The judgment is, therefore, affirmed, in all respects, except as to the mentioned items.

The cause is remanded to the trial court with direction to modify the findings and judgment, and allow recovery by the appellant of the amounts paid as the increased indirect shipping and compressor charges.

7. " Hence, if the construction given by the trial court is one which is tenable, and one which appears to us consistent with the true intent and meaning of the parties, it would not lie within the province of an appellate court to set aside the judgment of the trial court and substitute its own interpretation, simply because another interpretation thereof is also possible." Manley v. Pacific Mill & Timber Co., 1926, 79 Cal.App. 641, 648, 250 P. 710, 713.