[Civ. No. 28680. Fourth Dist., Div. One. June 27, 1984.]

OCEANSIDE MOBILEHOME PARK OWNERS' ASSOCIATION,
Plaintiff and Respondent, v.
CITY OF OCEANSIDE et al., Defendants and Appellants.

888

890

COUNSEL

Charles R. Revlett, City Attorney, Warren B. Diven and Amy Greyson, Assistant City Attorneys, Jennings, Engstrand & Henrikson, C. Michael Cowett and Henry E. Heater for Defendants and Appellants.

D. Dwight Worden as Amicus Curiae on behalf of Defendants and Appellants.

Lazof & Swanson, C. Brent Swanson and Terry R. Dowdall for Plaintiff and Respondent.

Walters & Ward and R. Michael Walters as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**WORK, J.**—The City of Oceanside appeals an order preliminarily enjoining it from applying and enforcing its mobilehome park rent control ordinance. The trial court held the ordinance facially unconstitutional because it believed the formula for setting initial rents and providing for adjustments fails to consider the property's fair market value and existing general market

conditions and deprives park owners of a fair rate of return on their property. The city also challenges the trial court's finding other provisions facially invalid, but alternatively argues they are of subordinate importance and even if invalid they may be severed from the remainder of the ordinance.

For the reasons which follow, we conclude: (1) the reasonable return on fair market value standard is not constitutionally required; (2) the fair or maintenance of net operating income standard effectively allows property owners a just and reasonable return; (3) the ordinance insures a just and reasonable return under general market conditions; (4) by limiting the restriction of an annual adjustment (except for certain passthrough adjustments) to only permissive adjustments, the ordinance is not constitutionally deficient for not allowing the Commission to adjust maximum rents without a substantially greater delay than is practically necessary; (5) the space rent agreement exemption is constitutionally valid; (6) there is a rational basis for limiting the amount of owner-performed labor which can be deemed an operating expense; (7) the provision excluding all attorney fees and costs incurred in challenging the ordinance or related proceedings from operating expenses is constitutionally valid; and (8) there is a rational basis for requiring park owners to obtain a tenant's prior consent before including capital expenditures designed to upgrade the premises, as operating expenses.

I

FACTUAL AND PROCEDURAL BACKGROUND[1]

*The Ordinance*

Ordinance No. 82-27, entitled "An Ordinance of the City of Oceanside, California, amending chapter 16B of the Oceanside City Code," was enacted because of low vacancy rates for manufactured homes and rapidly escalating rents. A shortage of vacant spaces makes alternative sites for relocation difficult to find. The problem of shortage of vacant spaces is compounded by miscellaneous restrictions on manufactured homes in many parks, and the installation requirements of manufactured homes, including permits, landscaping and site preparation. Moreover, the cost for moving a manufactured home is substantial with significant risk of damage. The ordinance explains these conditions create a captive market of manufactured

---

[1]Because this appeal narrowly focuses upon the facial constitutionality of ordinance No. 82-27, it is unnecessary to include the lengthy historical background underlying the enactment of the ordinance and three earlier mobilehome rent control ordinances, each declared facially unconstitutional.

homeowners whose immobility greatly imbalances "the bargaining position of the park owners and manufactured homeowners in favor of the park owners." (§ 16B.1.B.) The city council states the ordinance is "to facilitate and encourage fair bargaining between manufactured home owners and park owners in order to achieve mutually satisfactory agreement regarding space rental rates in manufactured home parks. Absent such agreements, this Council further finds and declares it necessary to protect the owners and residents of manufactured homes from unreasonable space rental increases while simultaneously recognizing and providing for the need of park owners to receive a just and reasonable return on their property." (§ 16B.1.D.)

In the event of a vacancy rate exceeding 5 percent, the ordinance is suspended, to be automatically reinstituted when the city council declares the vacancy rate to be 5 percent or less. The ordinance applies only to parks having more than 25 manufactured homesites and excludes tenancies under preexisting agreements exceeding a month-to-month tenancy until the agreement terminates.

The ordinance establishes a Manufactured Home Fair Practices Commission (Commission) and requires manufactured home park owners to register their home parks within 60 days of its effective date. The ordinance exempts parks where the park owner and at least one adult resident from 67 percent of the rental spaces within the park have entered into a space rent agreement establishing a space rent schedule for a term of at least two years.

The ordinance establishes the following rent control formula:

1. A rental base or "space rent ceiling" is established using the rent charged by the park owner in effect on December 31, 1979, or where no space rent was in effect on December 31, 1979, the rent charged on the first date space rent was charged after December 31, 1979.

2. Initial adjustments:

a. Permissive Adjustment: The park owner shall be entitled to an initial permissive adjustment to gross base rental income equal to the lesser of an eight percent increase per annum since the base year or an increase equal to the percentage increase in the consumer price index (CPI) from the end of the base year to the date of application for the adjustment.[2]

---

[2] The percentage increase in the CPI shall be calculated by subtracting the CPI reported for November 1979 from the most recently reported CPI preceding the application and then dividing this remainder by the November 1979 CPI.

b. Net Operating Income (NOI) Adjustment: If the park owner does not receive a just and reasonable return on his property after receiving the maximum permissive adjustment, he may apply with the Commission for an initial adjustment of the space rent ceiling. The park owner is entitled to an adjustment of the rent ceiling so as to enable his base year NOI to be increased by a rate equal to the lesser of (1) the percentage increase in the CPI since the end of the base year multiplied by that percentage of the CPI which composes the expenditure category of housing or the equivalent thereof, or (2) 40 percent of the percentage increase in the CPI since the end of the base year.

3. Annual Adjustments: Starting 1983, park owners shall be entitled to the following annual adjustment:

a. Permissive Adjustment: An annual permissive adjustment of gross space rental income equal to the lesser of eight percent increase or an increase equal to the percentage increase in the CPI from the date of the most recent initial or annual adjustment to the date of application for the proposed adjustment.

b. NOI Adjustment: Where the park owner does not receive a just and reasonable return on park property after receiving the maximum permissive adjustment provided above, he may apply to the Commission for an adjustment of the space rent ceiling. Park owner is entitled to an adjustment of the space rent ceiling so as to enable his NOI for the next year to be increased by a rate equal to the lesser of (1) the percentage increase in the CPI since the date of the most recent annual or initial adjustment multiplied by that percentage of the CPI which composes the expenditure category of housing or the equivalent thereof, or (2) 40 percent of the percentage increase in the CPI since the date of the most recent annual or initial adjustment.

c. Pass Through Adjustments: Park owner may at any time apply to the Commission for a pass through adjustment of the space rent ceiling to enable the park owner to pass on increases in governmental assessments and utility costs where such utilities are included in the space rent. Such adjustments are available for gas, electricity, water, trash and sewer service utility costs. When considering annual adjustment applications, pass through adjustments from the most recent preceding annual or initial adjustment shall not be included in the gross space rent income used to calculate any current annual adjustment to which the park owner may be entitled.

As defined, NOI equals gross income less operating expenses; gross income equals the sum of the gross space rent (computed at 100 percent

occupancy), other income generated as a result of operating the park (i.e., laundry facilities, recreational vehicle storage, etc.) and revenue received by the park owner from the sale of gas and electricity to park residents where such utilities are billed individually to the park residents by the park owner, less uncontrolled space rents due to vacancy and bad debts. Operating expenses include real property taxes and assessments, utility costs, listed management expenses, normal repair and maintenance expenses, operation and/or maintenance labor by the owner, operating supplies, insurance premiums prorated over the life of the policy, other taxes, fees, and permits, reserve for replacement of long-life items not exceeding 5 percent of the gross income, and necessary capital improvement costs exceeding existing reserves for replacement. Expenditures for capital improvement are allowable operating expenses only if the park owner has consulted with the park residents before beginning construction of the improvements and has received written consent from at least one adult resident from a majority of the manufactured home rental spaces. Operating expenses do not include debt service expenses (unless specifically provided), depreciation, any expense for which a park owner is reimbursed, attorney fees and costs incurred in proceedings before the Commission or in connection with legal proceedings against the Commission or challenging this chapter, and any late charges incurred for failure to pay registration fees to the city authorized by the ordinance. It further declares all operating expenses must be reasonable, placing the burden of proving reasonableness upon the park owner.

The ordinance outlines all hearing procedures, specifically requiring the Commission to schedule a hearing to commence no later than 30 days from receipt of the application and requiring the Commission to render its written findings and decision on the application within 14 calendar days from the date of the close of the hearing.

The ordinance presumes the NOI produced by a manufactured home park during the base year provided the park owner with a just and reasonable return; except when the NOI is less than 50 percent of the gross income in the base year, it is presumed the park owner received less than a just and reasonable return on the manufactured home park. In the latter event, gross income shall be adjusted upward to twice the amount of the base year operating expenses.

As to new manufactured home parks, the ordinance presumes the average NOI for the first three years of operation following the first residence occupation of a rental space provides the park owner with a just and reasonable return. Likewise, it is presumed where the average NOI for the first three

years of operation in a new manufactured home park is less than 50 percent of the average gross income for such period, the park owner was receiving less than a just and reasonable return. Consequently, the ordinance provides for the upward adjustment of the average gross income to twice the amount of the average operating expenses for that period.

Miscellaneously, the ordinance provides for nonwaiverability of its benefits by mobilehome park residents and severability of invalidated provisions or clauses from the ordinance.

*The Procedural Background*

The Oceanside Mobilehome Park Owners' Association (Association) challenged the constitutionality of the ordinance and requested a preliminary and permanent injunction, a declaration of its unconstitutionality, attorney fees and costs, exemplary and punitive damages of not less than $100,000 per defendant, and compensatory damages caused by its promulgation and application.

The trial court found city proved the existence of facts permitting it to enact a rent control ordinance; however, it found the ordinance facially unconstitutional because it does not include the fair market value of the park owner's property and general market conditions as factors in setting rents, thus denying park owners a just and reasonable return on their property. The court also found the long-term rental agreement exemption unconstitutionally interferes with the park owners' right to contract and denies them due process of law and equal protection of law. The court also held certain language within the rent ceiling adjustment provisions unconstitutionally allows the Commission to fix rent arbitrarily, to deny park owners a reasonable and just rent on their property, to confiscate their property and to deny them due process and equal protection of law.

As to operating expenses, the trial court held it was unconstitutional to exclude those expenses chargeable to owner-performed management or labor services (where the park owner does not devote at least 40 hours per week to such work and has not documented the time spent in providing such services). It made similar findings because operating expenses could not include costs of upgrading or altering existing facilities or increasing services (as opposed to maintaining existing facilities), unless the park owner first obtained the written consent of at least one adult resident from each of a majority of the mobilehome spaces. Further, the trial court found excluding park owners from including attorney fees and costs of proceedings challenging the ordinance or actions of the Commission as operating expenses

unconstitutionally chills their ability to exercise their rights to legally redress and protect their property rights.

## II

### THE FACIAL VALIDITY OF THE MAINTENANCE OF NET OPERATING INCOME STANDARD

*Standard of Review*

 Generally, a statute or local ordinance will be presumed to be constitutional unless its unconstitutionality clearly, positively and unmistakably appears. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 404 [149 Cal.Rptr. 375, 584 P.2d 512]; *In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]; *Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].) More specifically, rent control legislation will be held to be constitutionally valid as a proper exercise of the police powers so long as it is "reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001]; *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362, 368 [190 Cal.Rptr. 866].) "However, if it is apparent from the face of the provisions that their effect will necessarily be to lower rents more than could reasonably be considered to be required for the measure's stated purpose, they are unconstitutionally confiscatory." (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 165; *Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 13-16].) Although whether rent control legislation is reasonable or confiscatory depends ultimately on the result reached, it "may be invalid on its face when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties." (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 165; *Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284, 672 P.2d 1297].) "Facial validity, in short, is concerned more with excessive restriction than with comprehensiveness of regulation. 'Undoubtedly, rent control ordinances can be written which are so restrictive as to facially preclude any possibility of a just and reasonable return . . . . It is only these or comparably drastic ordinances which can be struck down as facially confiscatory.'" (*Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 291 [195 Cal.Rptr. 825], quoting *Hutton Park Gardens* v. *Town Council, supra,* 350 A.2d at p. 16.) ██ ██ ██ ██ Consequently, before rent control legislation becomes operative and actual rent ceilings imposed, the courts

may review the facial validity of a rent control provision for possible confiscatory effects. (*Cotati Alliance for Better Housing* v. *City of Cotati, supra,* 148 Cal.App.3d at p. 286; *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 165.)[3]

In determining the facial validity of this rent control ordinance we are mindful it need not articulate a formula for determining precisely what constitutes a just and reasonable return. For, "[r]ent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula. As the United States Supreme Court has stated, '[t]he Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas.' [Citations.] The method of regulating prices is immaterial so long as the result achieved is constitutionally acceptable. [Citation.]" (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson, supra,* 35 Cal.3d 184, 191.)

*The Reasonable Return on Fair Market Value Standard Is Not Constitutionally Required*

The trial court found the ordinance facially unconstitutional because in setting initial rents and providing for adjustments it does not guarantee the park owners a just and reasonable rate of return because the formulae employed do not include the fair market value of the property and the general market conditions as factors in setting and adjusting rents. The Association claims fair market value is the only nondiscriminatory criterion upon which to base current rent regulations and due process mandates use of a reasonable return on fair value standard. ■ We are unpersuaded, as we concur with the Courts of Appeal in *Cotati Alliance for Better Housing* v. *City of Cotati, supra,* 148 Cal.App.3d 280, 287-288, and *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles, supra,* 142 Cal.App.3d 362, 370-371, who have rejected the contention a return on value standard is constitutionally required.

The Association argues the Supreme Court's use of the phrase "reasonable return on property" in *Birkenfeld* was intended to invoke a fair market value standard, relying on governmental price regulation cases such as *Smyth* v. *Ames* (1898) 169 U.S. 466 [42 L.Ed. 819, 18 S.Ct. 418], *Market St. Ry. Co.* v. *Railroad Com.* (1944) 24 Cal.2d 378 [150 P.2d 196], *Contra*

---

[3]Procedurally, it is most appropriate for this matter to be resolved here. "Since the determination of the facial validity of an ordinance presents an issue of law, it is appropriate that the issue be settled on an appeal from an order granting a preliminary injunction enjoining the ordinances' enforcement." (*Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles, supra,* 142 Cal.App.3d 362, 368.)

*Costa Water Co.* v. *Oakland* (1911) 159 Cal. 323 [113 P. 668]. The Court of Appeal in *Palos Verdes, supra,* 142 Cal.App.3d 362, 370-371, rejected this precise argument: "We find nothing in *Birkenfeld* that would mandate such an interpretation of the just and reasonable standard. In public utility rate regulation cases, the United States Supreme Court has held that 'the Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas.' (*Power Comm'n.* v. *Pipeline Co.* (1942) 315 U.S. 575, 586 [86 L.Ed. 1037, 1049-1050, 62 S.Ct. 736].) In *Power Comm'n.* v. *Hope Gas Co.* (1944) 320 U.S. 591 [88 L.Ed. 333, 64 S.Ct. 281], the Supreme Court considered legislation calling for 'just and reasonable' gas rates, but which provided no express formula by which the 'just and reasonable' rate was to be determined. The Circuit Court had reversed a commission order setting rate bases because it determined the rate base should reflect the 'present fair value' of the gas company property. The court stated (320 U.S. at pp. 601-602 [88 L.Ed. at p. 344]): 'The fixing of prices, like other applications of police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. [Citations.] It does, however, indicate that "fair value" is the end product of the process of rate making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates cannot be made to depend upon "fair value" when the value of the going enterprise depends on earnings under whatever rates may be anticipated.'

"We also note that the fair return on present fair value of property formula has been expressly rejected in some rent control cases. In *Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65 at page 72], the court stated, 'After considering the massive record compiled by plaintiffs, we are satisfied that a value-based criterion for confiscation under rent control is practically unworkable.' (See *Wilson* v. *Brown* (E.C.A. 1943) 137 F.2d 348.)" (See also Note, *Rent Control and Landlords' Property Rights: The Reasonable Return Doctrine Revived* (1980) 33 Rutgers L.Rev. 165, 170-175.)

Likewise, the court in *Cotati Alliance for Better Housing* v. *City of Cotati, supra,* 148 Cal.App.3d 280, 287, stated: "We reject landlord's contention that a 'return on value' standard is mandated in order for a rent control ordinance to pass constitutional muster. The fatal flaw in the return on value standard is that income property most commonly is valued through capitalization of its income. Thus, the process of making individual rent adjustments on the basis of a return on value standard is meaningless because it is inevitably circular: value is determined by rental income, the amount of which is in turn set according to value. Use of a return on value standard

would thoroughly undermine rent control, since the use of uncontrolled income potential to determine value would result in the same rents as those as which would be charged in the absence of regulation. Value (and hence rents) would increase in a never-ending spiral. Similarly, as apparently was true in Cotati, if there was a housing shortage which caused rents to be artificially high, use of prerent control value as the measure will perpetuate artificially inflated rates. Rent control utilizing this standard is no rent control at all.''

Courts of other jurisdictions have also rejected the return on value standard for similar reasons. (See *Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65, 71-72]; *Troy Hills Village* v. *Township Council* (1975) 68 N.J. 604 [350 A.2d 34, 44-46]; *Mahoney* v. *Hoboken Rent Leveling Board* (1981) 178 N.J.Super. 51 [427 A.2d 1138, 1140]; and *Niles* v. *Boston Rent Control Administrator* (1978) 6 Mass.App. 135 [374 N.E.2d 296, 301].)

The Association relies on *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 85 [191 Cal.Rptr. 47], which approved a return on investment standard, contending it can be interpreted as holding due process requires a return on value. In *Gregory,* the court stated: ''Plaintiffs are correct that to accord with due process of law a rent control ordinance must permit rents that will allow an efficient owner a fair return on the value of his property.'' (*Ibid.*) However, we agree with *Cotati Alliance for Better Housing* v. *City of Cotati, supra,* 148 Cal.App.3d 280, 288-289, in its disagreement with *Gregory.* The former court aptly noted: ''[T]he assertion that due process requires a return on value ignores the unavoidable circularity problem inherent in the assurance of such a return. Indeed, the single decision cited by *Gregory* (*id.,* 142 Cal.App.3d at p. 85) as direct support for this assertion, *Helmsley* v. *Borough of Fort Lee,* actually *rejected* a value-based standard because of the circularity problem.''[4]

*A Just and Reasonable Return Must Be Provided at All Times Without Delay*

The Association contends the delay inherent within the procedure for notice, hearing and decision, combined with the 60 days notice to the homeowner of any increase in his or her rent required by Civil Code section

---

[4]Moreover, our Supreme Court has upheld as constitutional two rent control ordinances which did not expressly include current fair market value of the controlled property within the nonexclusive list of factors to be considered in reviewing petitions for rent adjustments. (See *Carson Mobilehome Park Owners' Assn.* v. *City of Carson, supra,* 35 Cal.3d 184, 188, fn. 2; and *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 167-168.)

798.30, as well as restricting a park owner to adjustments only once a year, renders the Oceanside ordinance unconstitutionally confiscatory under *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129. "Where rent ceilings of an indefinite duration are established, a mechanism must be provided for granting those increases necessary to permit landlords a just and reasonable return. 'The mechanism is sufficient for the required purpose only if it is capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary. "Property may be as effectively taken by a long continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them . . . ." ' [Citation.] Some delay is, of course, inherent in all rent control procedures. However, only those delays which are longer than practically necessary to achieve the legitimate purposes of the legislation are constitutionally proscribed." (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson, supra,* 35 Cal.3d 184, 191-192, quoting in part *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 169.)

■ Pursuant to section 16B.15.B and I, the Commission must hear an application within 30 days of submission and render written findings and decision within 14 calendar days from the date of the hearing. Adding the 60 days required written notice of a rent increase under Civil Code section 798.30 and assuming an average hearing will not exceed 3 days, there are approximately 110 days between the date of the submission of the application and the effective date of any rent increase. Guided by the Supreme Court's decision in *Carson Mobilehome Park Owners' Assn.* v. *City of Carson, supra,* 35 Cal.3d 184, 191-196, we conclude the delay inherent in the rent adjustment procedures of this ordinance is not substantially greater than is practically necessary and, thus, is reasonable and constitutionally permissible. (See *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 169.)

■ The Oceanside ordinance also expressly provides that no annual adjustment shall become effective if a previous annual adjustment became effective within the previous 12 months, although it may be approved within the 12-month period. (§ 16B.9.C.3.) The impact of permitting only annual permissive rent ceiling adjustments is minimized because a park owner may apply at *any time* for additional immediate passthrough adjustments of the space rent ceiling for interim increases in governmental assessments and utility costs (§ 16B.9.D). We perceive no valid reason for not immediately implementing those approved increases based upon NOI adjustment applications. Under the ordinance, a park owner must fall behind the permitted rent ceiling before obtaining an increase. "The confiscation precedes the redress in this case. Some short-term uncompensated confiscation may well be unavoidable under rent control, but it is essential that the severity and

duration of such takings be minimized." (*Helmsley* v. *Borough of Fort Lee, supra,* 394 A.2d 65, 78.) Because there is no practical necessity to deprive park owners of economic relief already approved on their NOI adjustment applications, we construe the language of section 16B.9.C.3, providing "[n]o annual adjustment shall become effective if a previous annual adjustment became effective within the previous twelve (12) months" as applying only to "permissive" adjustments.

*The FNOI Standard Constitutes a Reasonable Means for Accomplishing the Legitimate Governmental Purpose of Insuring a Just and Reasonable Return*

The city contends the ordinance guarantees park owners a just and reasonable return by permitting them to increase their rents to at least maintain their NOI at the 1979 level, with adjustments for inflation because the rents were set by park owners that year in a free market so that the net income produced necessarily reflected general market conditions. In any event, the city notes if for some reason the park owner was behind the general market in 1979, the ordinance permits him to increase the base 1979 rents to reflect the market conditions. ■ By permitting park owners to adjust their rents based upon a percentage rental increase equal to the percentage increase in the CPI or 8 percent whichever is lower, or an increase to insure his NOI or profit is increased by a percentage equal to the lesser of the housing component of the CPI or 40 percent of the CPI, the ordinance permits the NOI to be adjusted upward to account for inflation. Because the CPI is a statistical snapshot of general market conditions, this ordinance essentially permits park owners to obtain a just and reasonable return under general marketing conditions in any given year.[5]

The FNOI standard is "designed to guarantee landlords at least the same rate of return, with adjustments for inflation, they experienced prior to the enactment of rent control. This approach is termed the 'maintenance of profit approach,' 'historic return approach,' or 'fair operating income approach.' Pursuant to [applicable] . . . guidelines, . . . [the Commission] may grant increases in rent where the maximum rent or adjusted maximum rent allowed to a landlord under the ordinance does not constitute a just and

---

[5]The Consumer Price Index is a statistical measure of fluctuations in urban consumers' costs of living widely used to measure the dollar's purchasing power. The United States Bureau of Labor Statistics computes the index by calculating percentage price changes of a sample "market basket" of goods and services in major expenditure groups, then weighs the percentage price changes in accordance with the relative importance of each item. The index is the average of these weighted percentage price changes. (See Comment, *Rent Control: A Practical Guide For Tenant Organizations* (1978) 15 San Diego L.Rev. 1185, 1196-1199, fn. 101.)

reasonable return. A just and reasonable return under the guidelines is that level of rent necessary to enable the landlord to maintain the same net profit as obtained in the last year there was an unregulated housing market." (*Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles, supra,* 142 Cal.App.3d 362, 371.) As described above, the Oceanside ordinance provides an automatic or permissive adjustment formula permitting the rent to be increased by a certain percentage, or an adjustment determined by the profit maintenance formula which permits the raising of the NOI by a certain percentage.

We conclude employing the latter standard to guarantee park owners a fair NOI is facially constitutional. The Oceanside ordinance permits park owners to adjust for inflation to maintain the same NOI they enjoyed in the rental market before rent control. It insures the NOI established for a park owner is fair by permitting him to adjust it to a level equal at least to 50 percent of his gross operating income during the base year.

The FNOI standard "avoids the primary failure of the cost-of-living increase system in that it distinguishes between increasing costs of operation and fixed costs of mortgage principal and interest . . . . [¶] [Moreover] this standard gives an owner the incentive to spend money to properly maintain his property. Assuming those costs are reasonable, they will be paid from rental income and will be considered in computing an increase in net operating income." (Note, *Rethinking Rent Control: An Analysis of "Fair Return"* (1981) 12 Rutgers L.J. 617, 647.)

Courts of various jurisdictions have upheld in concept rent control ordinances which employ standards based upon a theory of guaranteeing property owners a fair NOI. (See, e.g., *Kargman* v. *Sullivan* (1st Cir. 1978) 582 F.2d 131, 134; *Niles* v. *Boston Rent Control Administrator, supra,* 374 N.E.2d 296, 300-303; *Marshal House, Inc.* v. *Rent Control Bd. of Brookline* (1971) 358 Mass. 686 [266 N.E.2d 876, 887-890].) The FNOI approach has been described as the most easily administered basis for determining rate of return within this context. This standard tends to reflect the tenant's interest by giving the park owner an incentive to incur all reasonable expenses for maintenance and services. (See *Rethinking Rent Control: An Analysis of "Fair Return," supra,* 12 Rutgers L.J. at p. 650.) Indeed, " 'The maintenance-of-net-operating-income standard is consistent with the view that rent should be allowed to increase at the same rate that operating costs increase. Its use avoids the necessity of having to undertake the administratively difficult (if not impossible) task of calculating equity and/or fair market value. It also recognizes the reality that profit levels vary greatly between buildings, depending on their location and expected future appre-

ciation. Therefore, rather than designating a uniform rate of return as equitable for all owners, it maintains owner's net operating income at former levels." (Baar & Keating, *Fair Return Standards and Hardship Appeal Procedures: A Guide for New Jersey Rent Leveling Boards* (June 1981) Nat. Housing L. Project xix; see *id.*, at pp. 98-99, 120.)

The facial constitutionality of the ordinance employing the maintenance of NOI standard is apparent, as the formula guarantees park owners a hardship increase if their NOI has declined from its level during the base period. The ordinance provides the park owner with an initial permissive upward percentage adjustment. If that increase is insufficient to provide a just and reasonable return on property because of an increase in operating expenses, the owner may employ the profit maintenance formula permitting the NOI to be raised further. This formula is designed to insure the park owner his original profit over operating expenses (NOI) and the percentage increase authorized by the latter formula. The profit maintenance formula within section 16B.14 passes through all the park owner's reasonable operating expenses before determining the amount of profit entitlement.[6]

The Association contends the apparent fairness of the NOI formula is illusory because a permissive adjustment always exceeds the NOI adjustment. It explains that, as a practical matter, the NOI adjustment provisions always result in a lower rent increase than that permitted by the permissive adjustment formula because the percentage increase provided by the former is multiplied by the NOI, while the percentage derived from the latter formula is multiplied by the gross rents. Consequently, unless the park owner has no expenses, NOI always will be less than gross rents and, thus, if the same percentage increase is employed, the NOI product always will be less than the gross rents product. The city responds by arguing the Association ignores the essential difference between the two formulae, i.e., the permissive adjustment formula increases gross rental income while the profit maintenance formula addresses an increase in NOI. However, the comparison is inappropriate. Whenever a park owner's costs exceed the rate of inflation, a given percentage increase in his NOI will give him a greater profit than a corresponding percentage increase in rent. The NOI maintenance formula responds to the situation where the CPI increase exceeds 8 percent and a park owner's costs also exceed 8 percent and, thus, the former increase may

---

[6]The permissive formula may not maintain a park owner's profit where either the CPI increase exceeds 8 percent and the park owner's operating expenses also exceed 8 percent, or where inflation does not exceed 8 percent and a corresponding increase in rent may not maintain a park owner's profit where certain of his expenses have dramatically exceeded the increase in inflation. The NOI maintenance formula was designed as a curative measure to the cited potential contingencies.

not be sufficient for the park owner to maintain his proper level. Thus, the NOI maintenance formula permits a park owner to recoup all reasonable costs no matter how much they have increased by adjusting the NOI in accordance with the CPI to maintain the profit level regardless of increases in costs. The park owner receives, through an increase in NOI, not only that increase in profit but also the "pass through" of the increase in operating costs.

Where the percentage increase under the permissive formula is insufficient, the profit maintenance formula provides park owners with rental increases including not only the increase in reasonable operating expenses but also a percentage increase for actual inflation. No special hearing is required to consider situations where costs have outpaced inflation, because all reasonable operating costs are passed through to the lessee regardless if they accelerate faster or slower than the inflation rate. It is the park owner's profits, not operating expenses, which are regulated in accordance with inflation.

*The Ordinance Assures a Just and Reasonable Return Under General Market Conditions*

The trial court erred in holding the ordinance does not include general market conditions as a factor in setting and adjusting rents. Rent control attempts to restore free market conditions by limiting rent increases to that level which would occur under general market conditions—a competitive housing market as opposed to a monopolistic or oligopolistic one. By reducing rents to levels existing on December 31, 1979, and implementing other protective measures, the ordinance does incorporate general market conditions into the rent-fixing formula.

However, the Association claims the presumption that a 1979 NOI will result in a just and reasonable return on property is invalid. Listing various reasons why operating expenses during a given year could be unusually high or low, the Association contends the 1979 NOI is only an historic accident which now shackles all major Oceanside park owners forever. Although special circumstances during any given year may affect gross operating expenses, the Association does not show the rents set by park owners in 1979 did not reflect general market conditions.

"Rent control enactments typically use the rent charged on a prior date as a starting point for the fixing of maximum rents on the theory that it approximates the rent that would be paid in an open market without the upward pressures that the imposition of rent control is intended to counter-

act. [Citations.] The prior date is set early enough to avoid incorporating last-minute increases made by landlords in anticipation of the controls. [Citation.]" (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 166; see Comment, *Rent Control: A Practical Guide For Tenant Organizations, supra,* 15 San Diego L.Rev. 1185, 1196-1197.) If the Association's objection is directed at the impropriety of fixing maximum rents as of a given date, then it is without merit, "for this is the method of rent control to which there has been the widest resort [citation], and its constitutionality has been universally upheld. [Fn. omitted.]" (*Marshal House, Inc.* v. *Rent Control Bd. of Brookline, supra,* 266 N.E.2d 876, 886.) On the other hand, if the Association is claiming the rollback date is arbitrary and bears no relationship to any ascertainable rent increase, it fails to provide evidence establishing that fact.

Apparently, the December 31, 1979, date was selected because it constituted the most recent year in which arm's length rents had been established in a freely operating market unencumbered by rent control. Such a procedure has been explained as follows: "Institution of a rollback provides a safeguard against freezing last minute rent increases into controlled rental levels and carries the advantage of setting rents 'at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market' [citation] at a time either before undue rent increases commenced or at least before they became so evident." (*Marshall House, Inc.* v. *Rent Control Bd. of Brookline, supra,* 266 N.E.2d 876, 886, quoting *Hillcrest Terrace Corp.* v. *Brown* (Em.Ct.App. 1943) 137 F.2d 663, 664.) The 1979 rollback date appears to favor the park owners, both because those rents were inflated because of a high demand and low vacancy rate, and because rent control was "in the wind."

Finally, the Association argues this ordinance merely transfers the monopolistic advantage over residents from the park owner to the selling tenant, to the disadvantage of prospective tenants and to the detriment of the park owner, a share of whose unregulated profit is now shifted to the selling tenant. An amicus brief filed on behalf of the Association[7] characterizes this perceived effect as an uncompensated taking of property violating the Fifth and Fourteenth Amendments to the federal Constitution and sections 1 and 19 of article I of the California Constitution. It reasons, "where rents are reduced more than required for the purposes of the police power, an artificially reduced rent ceiling results, which constitutes a valuable interest to the existing tenant which may be sold to a buyer of the mobilehome under the requirements of State law. The combined effect of the Mobilehome Re-

---

[7]Submitted by San Diego Manufactured Housing Educational Trust.

sidency Law (Civ. Code, § 798 et seq.) and the Ordinance assures this result." Thus, amicus argues, a park owner is bound to accept a selling tenant's assignment of an existing lease (Civ. Code, § 798.74), and a selling tenant with a favorable rent-controlled lease may be able to sell the onsite mobilehome for a higher price than can be obtained for the identical mobilehome situated in an unregulated park of identical quality where higher rents are being charged.

The amicus' initial premise is flawed. The ordinance is structured to establish a fair base rent which reflects general market conditions and incorporates relevant pricing factors. Rents will not be "reduced more than required for the purposes of the police power."

In summary, "to be 'just and reasonable' a rate of return must be high enough to encourage good management including adequate maintenance of services, to furnish a reward for efficiency, to discourage the flight of capital from the rental housing market, and to enable operators to maintain and support their credit. A just and reasonable return is one which is generally commensurate with returns on investments in other enterprises having corresponding risks. On the other hand, it is also one which is not so high as to defeat the purposes of rent control nor permit landlords to demand of tenants more than the fair value of the property and services which are provided." (*Troy Hills Village* v. *Township Council, supra,* 350 A.2d 34, 47.) Thus, "[t]he rate of return permitted may not be as high as prevailed in the industry prior to regulation nor as much as the investor might obtain by placing his capital elsewhere." (*Hutton Park Gardens* v. *Town Council, supra,* 350 A.2d 1, 15.) Finally, "[c]onstitutional provisions do not require that rent control ordinances allow landlords to recover all increases in their operating expenses; they require only that the landlord be permitted to obtain a just and reasonable return." (*Brunetti* v. *Borough of New Milford* (N.J. 1975) 350 A.2d 19, 30; *Helmsley* v. *Borough of Fort Lee, supra,* 394 A.2d 65, 76.) Accordingly, using the fair or maintenance NOI standard does not render the ordinance facially invalid.

Although not contested by respondent, amicus further argues that the ordinance is necessarily confiscatory because it precludes the Commission from considering all relevant economic factors when considering whether a "hardship" adjustment to rents is needed to give park owners a "just and reasonable return." Amicus claims the ordinance containing a list of factors from which the Commission may not deviate even though park owners may prove the rents, even as adjusted by the FNOI formula, are not sufficient to prevent loss of their property. While the city contends it has not failed to include any factor which could potentially be relevant to the Commission's

evaluation, it states that body is given discretion to consider *all* relevant factors by the express terms of section 16B.15.C. ■ This provision states that the Commission "shall hear all offered testimony and receive all offered documentary evidence relevant to the petition" when hearing rent adjustment applications. The Association (and its amicus) refuse to accept the city's concession and insists the quoted language can be construed differently. However, on review of a preliminary injunction, we must determine whether the ordinance on its face can be construed to permit its application in a constitutional manner. We believe the quoted language from section 16B.15.C expressly permits the Commission to receive and consider all evidence relevant to determine whether a park owner is entitled to an additional increase under the maintenance of net operating income formula.

III

THE VALIDITY OF THE REMAINING
STRUCK-DOWN ORDINANCE PROVISIONS

*The Space Rent Agreement Exemption Is Valid in Its Entirety*

The trial court erred in declaring the provision exempting rental agreements in excess of two years upon consent of at least one adult resident from 67 percent of the rental spaces of the park[8] interferes with the park owners' right to contract, denies them due process and equal protection of law.

■ The provision in controversy encompasses agreements between the park owner and the residents establishing a park space-rent schedule for at least two years. The requirement the agreement be voluntarily consented to by at least one adult resident from 67 percent of the rental spaces within the park was to prevent a park owner from using the exemption to force individual tenants vying for the scarce spaces into agreeing to free the park owner of the ordinance's rent-fixing formula. Requiring 67 percent tenant approval safeguards the ordinance's underlying purposes while at the same time providing for reasonable alternative long-term rent schedule agreements exempting the park owner from its provisions. It is likely a rent schedule consented to by at least one adult resident from 67 percent of the rental spaces within the park will reflect an agreement consistent with the tenants' interests and the underlying purposes of the ordinance.

The disputed provision does not unconstitutionally impair the obligation of contracts because it affects only prospective contracts. The contract

---

[8]Section 16B.7.B.3.

clause prohibits only statutes impairing existing contracts. (*Watson* v. *Employers Liability Assurance Corp.* (1954) 348 U.S. 66, 70 [99 L.Ed. 74, 80, 75 S.Ct. 166]; *Munday* v. *Wisconsin Trust Co.* (1920) 252 U.S. 499, 502 [64 L.Ed. 684, 689, 40 S.Ct. 365]; 13 Cal.Jur.3d (1974) Constitutional Law, § 280, pp. 522-523.)

*Section 16B.14.A.5 Limiting the Amount of Owner-performed Labor Which Can Be Deemed an Operating Expense Is Valid*

In determining the validity of these provisions, our sole concern is whether they reasonably relate to a legitimate governmental purpose and we must avoid confusing reasonableness in this context with wisdom. (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, 159, 165.) The provision we review permits a limited portion of owner-performed labor in operating and maintaining a park to be included as operating expenses; provides a maximum allowance of five percent of the gross income unless such a limitation would be substantially unfair; establishes a presumption a park owner must devote substantially all of his or her time (i.e., at least 40 hours per week) to performing such managerial or maintenance services to warrant the maximum 5 percent allowance; and declares no allowance shall be authorized unless a park owner documents the hours spent and the nature of the services provided.

There is a rational basis to require park owners to document their time and for presuming they must devote nearly all of their time to the park to qualify these activities as legitimate operating expenses. Regarding the former, under the NOI approach it is necessary to document operating expenses to provide the Commission with adequate facts to determine reasonableness of claimed expenses. As to the latter, the presumption safeguards the integrity of the NOI process by avoiding potential abuse of owner/management fees constituting operating expenses.

*The Attorney Fees Exclusion Is Constitutional*

Section 16B.14.B.4 of the ordinance excludes from operating expenses "[a]ttorneys fees and costs incurred in proceedings before the Commission, or in connection with legal proceedings against the Commission or challenging this [ordinance]." The trial court incorrectly determined this provision unconstitutionally impedes park owners from seeking legal redress and representation to protect their property interests. The provision only prevents park owners from passing the burden of those fees to their tenants in the form of higher rents regardless of the outcome of the proceedings. The exclusion has no more of a "chilling effect" on park owners' rights to

pursue their legal remedies than does the traditional American rule denying litigant attorney fees in the absence of express authority. Further, the burden on park owners is likely to be less than on the tenants, because the park owners are able to treat these attorney fees as business deductions for income tax purposes.

### Capital Improvements as Operating Expenses

The ordinance permits a park owner to include as operating expenses, any capital improvement costs exceeding existing reserves for replacement "required to maintain the common facilities in areas of the park in a decent, safe, and sanitary condition or to maintain the existing level of park amenities and services." (§ 16B.14.A.10.) However, it limits recovery of expenditures for capital improvements to *upgrade* existing facilities or to *increase* amenities or services as permissible operating expenses. To recoup these, the park owner must obtain the prior written consent from at least one adult resident from each of a majority of the rental spaces to include the costs of the improvement as an operating expense. The trial court erroneously held the consent provision (§ 16B.14.A.10.b) unconstitutionally denied park owners equal protection and due process.

The Association claims it is not rational to require the residents consent to capital improvements to upgrade existing facilities or to increase amenities or services as a condition precedent to using them as operating expenses because it is not related to the underlying governmental purpose of eliminating excessive rents caused by a housing shortage. It argues the park's capital improvements increase the value of not only the park, but also the residents' homes. The Association adds, residents may view improvements simply in terms of its effect on rents and thus withhold consent, although the improvement is necessary and desirable and could ultimately reduce maintenance expenses.

Preliminarily, we stress this provision affects only the park owners' rights to use such costs as operating expenses and does not affect their right to develop parks at their own expense as an "investment" to be recouped on future sale. (See *Gregory, supra,* 142 Cal.App.3d 72-86.) Contrary to the Association's argument, the prior consent provision promotes the underlying purpose of the ordinance and realistically addresses the fact mobilehome owners are enclosed within a captive market. The Association incorrectly claims the provision does not rationally respond to the underlying purposes of the ordinance because it does not relate to eliminating excessive rents created by exploiting market conditions (i.e., an actual housing shortage). However, by requiring prior consent of a majority of the renters, the ordi-

nance recognizes not only the realities of a captive market, but also the proprietary interests mobilehome owners have individually and cumulatively in their homes and appurtenances.[9] Presumably, the prior consent clause assists in insuring that only capital improvements designed to upgrade the premises which are worthwhile to the tenants in light of the market conditions and their personal incomes, will be considered as operating expenses. Finally, limiting the disputed provision to upgrading, not maintaining, assures its constitutionality by not infringing upon the park owners' rights to safeguard and preserve the value of their property.

*Disposition:*[10]

The order is reversed.

Staniforth, Acting P. J., and Wiener, J., concurred.

A petition for a rehearing was denied July 19, 1984, and respondent's petition for a hearing by the Supreme Court was denied August 23, 1984.

---

[9]Within section 16B.1.C, the ordinance declares: "Manufactured home owners are property owners with sizeable investments in their manufactured homes and appurtenances. Collectively, the manufactured home owners have a greater investment than does the manufactured home park owner. The residents of manufactured home parks consider their relationship with the park owner as a joint housing venture.

"The continuing possibility of unreasonable space rental increases in manufactured home parks threatens to diminish the value of the investment of the manufactured home owners.

"Further, existing state law permits manufactured home park owners to require manufactured home owners to make modifications to their homes for reasons of aesthetics or conformity to park standards that amount to capital improvements which would accrue to the benefit of the park owner by potentially increasing the market value of the park itself."

[10]The city asks us to sanction the Association for designating an excessive record, under California Rules of Court, rule 26(a). We decline to do so.